## WILLIAMS *v.* THE STATE.

1. There was no error, on the trial of a criminal case, in admitting against the accused evidence showing that she had upon her person and about her premises articles the possession of which, though not in itself criminal, tended to establish her guilt of the offense with which she was charged, notwithstanding it appeared that the discovery of these articles was made by forcibly entering into her house and there searching the same and her person without any warrant or authority of law. Although the search and seizure may have been unlawful, unwarranted, unreasonable and reprehensible, this did not affect the admissibility of the evidence obtained as a result thereof.

2. The offense of keeping open a tippling-house on the Sabbath day is sufficiently proved by evidence showing that the accused, on at least three different Sundays within the same year, in her dwelling-house, sold whisky by retail to different persons, and on each occasion permitted the same, or a portion thereof, to be drunk on the premises.

Argued February 15,—Decided March 12, 1897.

Indictment for keeping open tippling-house on Sunday. Before Judge Ross. City court of Macon. December term, 1896.

*Marion Harris,* for plaintiff in error.
*Robert Hodges, solicitor-general,* contra.

LUMPKIN, Presiding Justice.

1. On the trial of this case in the court below, Jenkins, a detective, was introduced as a witness in behalf of the State. It appeared from his testimony that on Sunday morning, the second day of August, 1896, Mose Lucas and Jessie Bunkley, both colored, came to his house in Macon and "woke him up," Lucas saying that if he "wanted to catch those parties down on Third street selling whisky, now was the time." He gave to Lucas "a silver quarter, marked with a cross," and "an empty half-pint whisky flask, with a file on the neck thereof," and to Bunkley "a silver ten cents piece, marked with a cross on the woman's head." Both then went on down the street in the direction of the house of Sarah Williams, the accused. "In about five minutes, these two men came out of Sarah's back yard, and Mose Lucas handed [Jenkins] the same bottle that [he] had given him, and in the same condition, except that it was full of whisky." As to what then transpired, Jenkins testified: "I called police officer Charley Moseley, and we went to Sarah's house. We went in, and I walked up to Sarah and put my hand in her apron pocket, took out her purse, and found these two pieces of money in it. The two pieces of money are the same I marked and gave to Lucas and Bunkley. I then searched her house and found a gallon jug of blackberry wine, and three bottles, to wit, two quart bottles and one half-gallon bottle. One of these bottles was nearly full of whisky, another had only the bottom covered with whisky, and the third, the half-gallon bottle, was full of something that looked like whisky, though I have never opened it, and do not know for certain what it contains. . . I had no search warrant to search either the defendant or the house."

Moseley, the police officer, who also appeared at the trial

as a witness, corroborated Jenkins as to the account above given of the search made by them, and the finding and seizure of the marked coins and the liquors; and identified a small tin funnel as having also been found at the same time. The "jug of wine, the half-gallon bottle of whisky, the quart bottle of whisky partly used, and the other bottle of whisky, which contained a little bit in the bottom of it," together with the tin funnel and "the twenty-five cent and ten cent pieces of silver money," were then tendered in evidence by the State, and admitted over objection by the accused.

All of the testimony of Jenkins and Moseley with regard to the search of the person and premises of the accused and the seizure of the articles above enumerated, was also specifically objected to on the grounds that this evidence "was obtained under the circumstances just narrated, and particularly that it was obtained from defendant and her house without a search-warrant; that this search was an illegal search and seizure in violation of the constitutional rights guaranteed to defendant as a citizen of the State and of the United States, under paragraph sixteen of the bill of rights of the State constitution of 1877, and under the United States constitution; that this was a constitutional right of defendant's to be secure in her person, property, home and effects, from such unlawful, unreasonable and outrageous searches and seizures; and defendant then and there [at the trial] claimed that right both under the State constitution and under the constitution of the United States, which prohibits the State or its officers from abridging the constitutional and inalienable rights, privileges and immunities of citizens of the United States. Defendant then and there insisted before the court, by way of objection to said evidence, that should it be admitted to the jury, it would violate the constitutional and inalienable right of defendant to be secure against such searches and seizures; and she then and there expressly claimed this right, privilege and immunity, not

only under the State constitution, but as one to which she was entitled under the United States constitution, and especially under the provisions of the first section of the fourteenth amendment to said United States constitution, she then and there claiming said rights, privileges and immunities as a citizen of the United States and of said State."

The position assumed by counsel for the accused does not present for determination a new question. That evidence pertinent and material to the issue is admissible, notwithstanding it may have been illegally procured by the party producing it, was early settled by the English courts. The case of Legatt v. Tollervey, 14 East, 302, to this effect, decided in 1811, followed a previous ruling made in Jordan v. Lewis (1739), the substance of which is stated in a note, as the report of the latter case in 2 Strange, 1122, was meagre and imperfect. And such was the rule observed in subsequent decisions. Caddy v. Barlow, 1 Man. & Ryl. 275; Stockfleth v. De Tastet, 4 Campb. 10; Robson v. Alexander, 1 M. & P. 448. In this country the question certainly arose as early as 1841. Com. v. Dana, 2 Metc. 329. There it was insisted that the issuing of a warrant authorizing a search of the premises of the accused, who was suspected of having in his possession lottery tickets, invaded his constitutional right to be secure against unreasonable searches and seizures, and "that the seizure of the lottery tickets and materials for a lottery, for the purpose of using them as evidence against the defendant, [was] virtually compelling him to furnish evidence against himself, in violation of another article in the declaration of rights." But Wilde, J., speaking for the Supreme Court of Massachusetts, summarily disposed of this contention by saying (page 337): "Admitting that the lottery tickets and materials were illegally seized, still this is no legal objection to the admission of them in evidence. If the search-warrant were illegal, or if the officer serving the warrant exceeded his authority, the party on whose complaint the warrant

issued, or the officer, would be responsible for the wrong done; but this is no good reason for excluding the papers seized as evidence, if they were pertinent to the issue, as they unquestionably were. When papers are offered in evidence, the court can take no notice how they were obtained, whether lawfully or unlawfully; nor would [it] form a collateral issue to determine that question," citing Legatt v. Tollervey, and Jordan v. Lewis, supra, and adding, "We are entirely satisfied that the principle on which these cases were decided is sound and well established." Such has been the view since entertained and consistently adhered to by the Massachusetts court: Com. v. Lottery Tickets, 5 Cush. 369, 374; Com. v. Intoxicating Liquors, 4 Allen, 593, 600; Com. v. Welsh, 110 Mass. 359, 360; Com. v. Taylor, 132 Mass. 261, 262; Com. v. Henderson, 140 Mass. 303, 305; Com. v. Keenan, 148 Mass. 470, 472, 20 N. E. Rep. 101; Com. v. Ryan, 157 Mass. 403, 405, 30 N. E. Rep. 364; Com. v. Tibbetts, 157 Mass. 519, 521, 32 N. E. Rep. 910; Com. v. Hurley, 158 Mass. 159, 33 N. E. Rep. 342; Com. v. Brelsford, 161 Mass. 61, 64, 36 N. E. Rep. 677; Com. v. Welch, 163 Mass. 372, 40 N. E. Rep. 103; Com. v. Smith, 166 Mass. 370, 376, 44 N. E. Rep. 503. It may here be remarked that no distinction is, or should be, observed between an unauthorized search of the person, and one which merely involves an invasion of the citizen's constitutional right to be secure in his "houses, papers and effects;" for none is recognized either by the Federal or by our State constitution, the right to be secure in the lawful possession and enjoyment of property evidently being regarded as no less sacred than the citizen's right to immunity from an unreasonable search of his person.

In Welch's case, just cited, it appeared that an officer unlawfully seized an object which a daughter of the accused was carrying under the folds of a loose dress, suspecting it to be a bottle of whisky, over the protest of the accused, who was present; but though the knowledge so acquired by

the officer was thus wrongfully obtained, he was nevertheless permitted to testify that the object she was carrying was, "in size and shape, like a quart bottle." In State *v.* Flynn, 36 N. H. 64, the court was called upon to pass on the same constitutional questions raised in Dana's case, supra, and unhesitatingly adopted as sound the conclusions reached by the Massachusetts court, holding that: "Evidence obtained by means of a search-warrant is not inadmissible, either upon the ground that it is in the nature of admissions made under duress, or that it is evidence which the defendant has been compelled to furnish against himself, or on the ground that the evidence has been unfairly or illegally obtained, even if it appears that the search-warrant was illegally issued. Citing the above case as authority, Mr. Bishop says: "The evidence which a search-warrant procures may be used against the party, not being inadmissible as an admission under duress furnished by the prisoner through compulsion against himself, or as otherwise unfairly or illegally obtained, even if the search-warrant was illegally issued." 1 Bish. Cr. Proced. §246; 1 Bish. New Cr. Proced. p. 148. Mr. Greenleaf evidently regarded the admissibility of evidence of this character as no longer a vexed, but as a definitely settled, question; for in his Treatise on the Law of Evidence (§254a.) he thus briefly deals with the subject: "It may be mentioned in this place that though papers and other subjects of evidence may have been *illegally taken* from the possession of the party against whom they are offered, or otherwise unlawfully obtained, this is no valid objection to their admissibility, if they are pertinent to the issue. The court will not take notice how they were obtained, whether lawfully or unlawfully, nor will it form an issue to determine that question." Almost identically the same language is to be found in 2 Taylor on Evidence (9th ed.), §922.

The correctness of the view announced by the Supreme Court of Massachusetts in the earlier part of this century has long been acquiesced in. In more recent years a few

attempts have been made in this country to overturn this now well established rule of evidence. They have, however, met with anything but success. In Illinois, South Carolina, Alabama, Missouri, Connecticut and Arkansas, the courts of last resort have declined to venture a departure from this sound doctrine. See Gindrat v. People, 138. Ill. 103, 27 N. E. Rep. 1085, wherein it was held that "the fact that evidences of the commission of a crime are found by a mere private detective on an unauthorized search of a party's rooms, will not, of itself, render the evidence thus found incompetent against the party in whose possession the articles are found, if such evidence is otherwise competent," which ruling was followed in the later cases of Siebert v. People, 143 Ill. 571, 32 N. E. Rep. 431, and Trask v. People, 151 Ill. 523, 38 N. E. Rep. 248. See also State v. Atkinson, 40 S. C. 363, 18 S. E. Rep. 1021, holding that papers illegally obtained by searching the room of the accused during his absence were competent evidence against him on a trial for murder; Shields v. State, 104 Ala. 35, 16 So. Rep. 85, holding that "on a trial for carrying concealed weapons, where it is shown that a pistol was found concealed on defendant's person as the result of a forcible search by an officer, the evidence of the discovery of the pistol concealed about his person is admissible against the defendant, although the search was unauthorized and unlawful;" State v. Pomeroy, 130 Mo. 489, 32 S. W. Rep. 1002, wherein it was decided that "it is not a violation of the constitutional provision that no one shall be compelled to testify against himself in a criminal case to introduce in evidence, in a prosecution for establishing a lottery, tickets, papers, etc., taken from the person and premises of the accused, even though they were seized without authority of law;" State v. Griswold, 67 Conn. 290, 34 Atl. Rep. 1046, 33 Law. Rep. An. 227, laying down the rule that "evidence otherwise pertinent and admissible will not be rejected because it was taken from the possession of the accused by a trespass;"

Starchman *v*. State, 36 S. W. Rep. 940, to the same effect, decided July 8, 1896, by the Supreme Court of Arkansas.

In the present case, counsel for the accused cited and relied upon the case of Boyd *v*. United States, 116 U. S. 616, as sustaining the contention that the constitutional rights of the accused were infringed by admitting the evidence to which objection was made. We do not think the decision rendered in that case is authority supporting this contention. A clear statement of the issues raised in it and of the precise questions passed on by the Federal Supreme Court is to be found in Gindrat *v*. People, supra, the able opinion in which, pronounced by Mr. Justice Baker of the Illinois supreme bench, relieves us from any necessity of attempting to show—as he does conclusively—that, so far as the question now before us is concerned, the decision in Boyd's case is not to be regarded as authoritative, or even pertinent. After citing a number of cases in point, he concludes his discussion of that decision by saying: "We think that the cases last cited, as well as the present case, are clearly distinguishable from Boyd *v*. United States. In the latter case, the unconstitutional and erroneous order, process and procedure of the trial court compelled the claimants to produce evidence against themselves, and such order, process and procedure were also held to be tantamount to an unreasonable search and seizure; while here, and in the other cases cited, the question of illegality was raised collaterally, and the courts exercised no compulsion whatever to procure evidence from the defendants, and neither made orders nor issued process authorizing or purporting to authorize a search of premises or a seizure of property or papers, but simply admitted evidence which was offered, without stopping to inquire whether possession of it had been obtained lawfully or unlawfully. Courts, in the administration of the criminal law, are not accustomed to be over-sensitive in regard to the sources from which evidence comes, and will avail themselves of all evidence that is competent and perti-

nent and not subversive of some constitutional or legal right." The case of Boyd v. United States was also relied on in Atkinson's case, supra, but McIver, C. J., speaking for the South Carolina court, after briefly summarizing the points passed on by the Supreme Court of the United States, says: "This case, therefore, while very interesting, as furnishing an able and elaborate discussion of the right of exemption from unreasonable searches and seizures, has no application to the present inquiry." In State v. Pomeroy, also above cited, it likewise was insisted that this decision of the Federal Supreme Court should control; but Sherwood, J., adopted the above extract taken from the opinion of Mr. Justice Baker, as expressing the view of the Missouri court that Boyd's case was entirely inapplicable. We confidently entertain the same opinion. Our attention has not been called to any case in which the Supreme Court of the United States has undertaken to pass upon the precise question now before us, nor are we aware of any decision by that court which has any direct bearing thereon. In Spies v. Illinois, 123 U. S. 131, the question was informally presented to the court, but not decided. Says Chief Justice Waite (page 180): "Something was said in argument about an alleged unreasonable search and seizure of the papers and property of some of the defendants, and their use in evidence at the trial of the case;   .   .   but we have not been referred to any part of the record in which it appears that objection was made to the use of this evidence on that account.   .   .   The question whether the letter, if obtained in the manner alleged, would have been competent evidence, is not before us."

Irrespective of the many respectable authorities above referred to, and speaking for ourselves, we are satisfied that the contention of the accused, that her constitutional rights were infringed by the ruling of the trial judge admitting the evidence complained of, ought not to be sustained. As we understand it, the main, if not the sole, purpose of our con-

stitutional inhibitions against unreasonable searches and seizures was to place a salutary restriction upon the powers of government. That is to say, we believe the framers of the constitution of the United States and of this and other States merely sought to provide against any attempt, by legislation or otherwise, *to authorize, justify* or *declare lawful* any unreasonable search or seizure. This wise restriction *was intended to operate upon legislative bodies, so as to* render ineffectual any effort to legalize by statute what the people expressly stipulated could in no event be made lawful; upon executives, so that no law violative of this constitutional inhibition should ever be enforced; and upon the judiciary, so as to render it the duty of the courts to denounce as unlawful every unreasonable search and seizure, whether confessedly without any color of authority, or sought to be justified under the guise of legislative sanction. For the misconduct of private persons, acting upon their individual responsibility and of their own volition, surely none of the three divisions of government is responsible. If an official, or a mere petty agent of the State, exceeds or abuses the authority with which he is clothed, he is to be deemed as acting, not for the State, but for himself only; and therefore he alone, and not the State, should be held accountable for his acts. If the constitutional rights of a citizen are invaded by a mere individual, the most that any branch of government can do is to afford the citizen such redress as is possible, and bring the wrong-doer to account for his unlawful conduct. The office of the Federal and State constitutions is simply to create and declare these rights. To the legislative branch of government is confided the power, and upon that branch alone devolves the duty, of framing such remedial laws as are best calculated to protect the citizen in the enjoyment of such rights, and as will render the same a real, and not an empty, blessing. With faithfully enforcing such laws as are thus provided, the responsibility

devolving upon the executive and judicial branches must necessarily end.

We know of no law in Georgia which renders inadmissible in evidence the fruits of an illegal and wrongful search and seizure; nor are we aware of any statute from which it could be logically gathered that the admission of such evidence violates any recognized principle of public policy. Whether or not prohibiting the courts from receiving evidence of this character would have any practical and salutary effect in discouraging unreasonable searches and seizures, and thus tend towards the preservation of the citizen's constitutional right to immunity therefrom, is a matter for legislative determination.

In *Rusher* v. *State*, 94 *Ga.* 363, this court sustained a ruling of the trial court admitting in evidence against the accused, who was on trial for burglary, evidence showing that money, the fruit of his alleged crime, was found in a place of concealment to which he had accompanied the State's witnesses and in which he had informed them it was secreted. All this evidence, including not only that which showed the independent fact of the discovery of the money, but also that which related to acts and declarations of the accused necessary to account for the discovery and explain the manner of it, was held admissible, although it appeared that these very acts and declarations were not free and voluntary, but the result of some sort of constraint or coercion. The foregoing statement fully discloses all that was really involved in the *Rusher* case with respect to the admissibility of evidence, and the conclusions reached upon the questions actually presented for decision do not in the least conflict with anything laid down in the case at bar. The headnotes were prepared and the opinion delivered by Ex-Chief Justice Bleckley, the eminent jurist, whose great wisdom and profound learning, demonstrated by his services upon this bench and elsewhere, have made for him a high place

among the recognized leaders of judicial thought in this day and generation.

Read without a firm grasp upon the facts, especially the great fact that while there was evidence enough to show coercion by some means not specified, there was no evidence to show any criminal breach of law by personal violence or otherwise in coercing the accused to speak and act, some of the language used in that opinion is perhaps open to misunderstanding. It does not hold that as matter of existing law, violence, even to the degree of torture, would render the evidence in that case inadmissible, but the opinion does say that the law ought to be that way and that any criminal breach of law whatever in the procurement of evidence ought to be a good legal reason for rejecting the evidence so procured. The case being one in which no crime whatever was in sight as means to coerce either speech or conduct, surely that case afforded no basis for adjudicating one way or the other the rule of existing law which governs the admissibility of speech and conduct brought about by the commission of a crime to induce the same or to gain information bearing on the offence for which the accused is being tried.

It is certainly good law, as announced in the first headnote of the *Rusher* case, that "the well established rule that independent facts discovered in consequence of a constrained confession made by a prisoner are admissible against him unless it appear that criminal violence was used in procuring the confession or making the discovery." It is only by treating this language as affirming by implication more than it expressly affirms, that it can be construed as ruling that the evidence would not be admissible if criminal violence were used in its procurement. When, however, the facts of the case are examined, it is manifest that they afford no basis for such a construction, inasmuch as it did not appear whether there was criminal violence or not. The express affirmation of the head-note, therefore, should not be enlarged by adding to it another affirmation neither made

directly nor called for by the facts. Moreover, if it had been the purpose of the court or of the writer of the opinion to lay down more law on the subject than was necessary to rule the case on its actual facts, the phrase "it may be" would have been altogether inappropriate as an opening of the topic. See text of opinion on page 366. On page 369 the opinion says: "The theory of whipping was left wholly unsupported; it has, therefore, no relevancy to the merits of the question." In view, therefore, of the overwhelming weight of authority by which the decision rendered in the present case is supported, and with the above explanation of the *Rusher* case, we are clear that it decides nothing which should constrain us to hold otherwise than we have done on the question now made.

The universally recognized rules governing the admissibility of confessions furnish much light touching the question whether, in passing upon the competency of evidence, the manner in which it was procured is ordinarily to be considered. It is an elementary rule of law that a confession unduly induced by the influence of hope or fear will never be received. This is true, however, not because it may have been procured by improper means, but solely because the truthfulness of a confession thus inspired is of such doubtful probability that it cannot reasonably be regarded as having any probative value. "A confession produced by artifice is not for that reason inadmissible, unless the artifice used was calculated to produce an *untrue* confession." 3 Am. & Eng. Enc. of Law, 481, citing numerous instances in which the courts have held confessions competent. So, also, "Although confessions made by threats or promises are not evidence, yet if they are attended with extraneous facts which show that they are true, any such facts thus developed, and which go to prove the crime of which the defendant was suspected, will be received as testimony; as, for instance, where the party so confessing points out or tells where the property stolen is, or where he states where the

·deceased was buried, or gives a clue to other evidence which proves the case." *Daniel* v. *State*, 78 *Ga.* 99. And to the ·same effect, see *Jones* v. *State*, 75 *Ga.* 825, and *Rusher* v. *State*, supra.

Of late, the courts of this country have many times been ·called upon to pass on the question whether a confession would be received where it appeared that the same had been secured by a detective introduced into the cell of a ·prisoner in the rôle of a supposed fellow-criminal, with a view to "worming out of" the prisoner admissions which ·could be construed into a confession of guilt. Heldt *v.* :State, 20 Neb. 492, 30 N. W. Rep. 626, 57 Am. Rep. 835, 9 Cr. Law Mag. 248; People *v.* Barker, 60 Mich. 277, 27 N. W. Rep. 539, 1 Am. St. Rep. 501; Burton *v.* State, 107 Ala. 108, 18 So. Rep. 284, and cases cited. Such a practice would indeed seem to be a pernicious one, having a tendency towards perverting rather than towards promoting the due ·course of justice. *Green* v. *State*, 88 *Ga.* 518, 519, 15 S. E. Rep. 10; *Smith* v. *State*, 88 *Ga.* 628, 15 S. E. Rep. 675. Nevertheless, while judges in dealing with the question have frequently and freely said as much, and have in no un-·certain language condemned the practice, we have found no :satisfactory authority, or reasoning, which would warrant ·the courts to usurp legislative functions by declaring that a resort to such methods is *a violation of public policy.* On ·the contrary, evidence thus acquired is, generally, if not universally, held to be competent, the manner in which it was procured going only to its credit. Thus, in Heldt *v.* State, just cited, a confession procured under such cir-·cumstances was held to be admissible in evidence, although Chief Justice Maxwell, in delivering the opinion of the ·court, took occasion to say of the detective who testified to the alleged confession: "A man who will deliberately in-:gratiate himself into the confidence of another for the pur-pose of betraying that confidence, and while with words ·of friendship upon his lips seeks by every means in his

power to obtain an admission which can be tortured into·
a confession of guilt, which he may blazon to the world
as a means to accomplish the downfall of one for whom
he professes great friendship, cannot be possessed of a
very high sense of honor or of moral obligation.    Hence
the law looks with suspicion on the testimony of such wit-·
nesses, and the jury should be specially instructed that
in weighing their testimony greater care is to be exer-
cised than in the case of witnesses wholly disinterested."·
Our own case of *Cornwall* v. *State*, 91 *Ga.* 277, 282, 18·
S. E. Rep. 154, is likewise in point.

We quite agree with counsel that in the present case there·
was an "unlawful, unreasonable and outrageous" search of
the person and the private dwelling of the accused.    No·
search is more unreasonable or more obnoxious to our funda-·
mental law than one without warrant, based upon a bare·
suspicion that a criminal offense has been committed.    *Pick-
ett* v. *State*, 99 *Ga.* 12, 25 S. E. Rep. 608.   The offenders·
certainly deserve to be severly dealt with for thus overstep-
ping the bounds of official authority.    Indeed, their offense
would seem to call for a more summary mode of redress·
than is now provided for by the laws of this State.    The citi-
zen's right to immunity from such outrages being considered
one so sacred as to demand constitutional preservation, it
would, in our opinion, be eminently proper for the General
Assembly to strive to discourage, and prevent as far as possi-·
ble, a willful disregard and violation of this right, by pro-
viding a punishment calculated to deter petty officials from
essaying to act as violators, rather than as conservators, of·
the law.

2. As will have been observed from the statement of
facts set forth at the beginning of this opinion, the accused
unquestionably had on hand, in abundant measure, the
means wherewith to administer to the demands of those de-
siring intoxicants, certainly to such of them as may have·
wished blackberry wine or whisky.    According to the testi-·

mony of Lucas, one of the persons whose services were enlisted in securing proof against her, both he and his companion, "on the second day of August, 1896, which day was Sunday," went into her house and bought from her small quantities of whisky, which they were permitted to drink upon the premises. "On two different Sundays" during that year, prior to the 2d day of August, this witness had gone to her house, and "each time bought a drink of whisky from her and drank it there." Indeed he testified: "I got it there whenever I wanted it; I went to her because I knew I could get it." Although Lucas further stated that he could not undertake to swear he had ever seen "her sell any whisky to anybody else except" his companion, he did profess to known the character of her house; and the circumstances brought to light by the State's evidence as a whole strongly tended to show that she was carrying on a more or less general, though perhaps surreptitious, Sunday traffic in spirituous and intoxicating liquors. At any rate, "whether the house where the liquor is charged to have been sold was a tippling-house, and whether the defendant kept it open on the Sabbath," were questions directly brought in issue by the evidence, and it was the province of the jury to determine what was the truth in that regard. *Kelly* v. *State*, 19 *Ga.* 426.

Our code does not attempt to define what shall constitute or be considered a "tippling-house." "It deals with [houses of this character] as establishments too well known to need description, and simply prescribes a penalty for keeping them open on the Sabbath-day or Sabbath-night." *Minor* v. *State*, 63 *Ga.* 321. Doubtless any one of the several slightly-varying definitions of the term given by law-writers is broad enough to cover such an establishment as that now under consideration. See 2 Bouv. Law Dic. 732; Black Law Dic. 1173; Anderson's Dic. of Law, 1034; Kinney's Law Dic. & Glos. 656; 26 Am. & Eng. Enc. of Law, 18. Were this otherwise, however, these definitions, purporting

to be general only and not altogther precise or exhaustive, are to be deemed sufficiently flexible and expansive to include every resort of that character which can reasonably be considered as having been aimed at by our statute. For, as was remarked in *Minor's* case, supra, by Bleckley, Justice, before he became Chief Justice, "the dictionary definition of a term is frequently the mere air of the music which the accused has attempted to execute with variations. Frequently, too, the variations are so luxuriant and ingenious, that the air is much disguised, and to hum it over from the bench is but little assistance to the jury in following the real performance. It is something easier for an offender to baffle the dictionary than the Penal Code, for the former is perplexed with verbal niceties and shades of meaning, while the latter grasps in a broad, practical way at the substantial transactions of men." In this connection see, also, *Hussey* v. *State*, 69 *Ga.* 58, 59. Our "courts are not very astute in shielding violators of this provision from punishment by resorting to the niceties of verbal criticism, such as would be intelligible only to grammarians and fastidious scholars, but would utterly fail to impress less cultivated minds and tastes, in order to provide for them a way to escape." *Sanders* v. *State*, 74 *Ga.* 85. Therefore, though the establishment presided over by the accused might, perhaps, be more graphically described as being what is colloquially termed a "blind tiger," as was suggested in the argument before us, it was nevertheless, in a legal sense, a "tippling-house." As to the length of time during which it had existed as such, the offense was fully made out, the proof showing that whisky was sold at retail on at least three different Sundays within the same year. While not professing to know exactly how long a period would have to elapse before a house of this kind could fairly be called a tippling-house, it would surely seem that three weeks would ordinarily be sufficient. Be this as it may, however, that with which we are now called upon to deal was shown by the prosecution to be capable, on

the last, if not upon the first, of the three Sundays in ques-- tion, of fully performing its office as a house of this charac- ter; and this being so, it is to be treated as being then in existence, irrespective of the precise date of its inception. When once a house becomes a tippling-house and exists as such, "if the owner keep it open but for a moment" on the Sabbath, he will be guilty of a violation of the statute. *Monses* v. *State*, 78 *Ga.* 110.

We have, therefore, reached the conclusion that for no reason assigned by the accused, or disclosed by the record brought to this court, should her conviction be set aside.

*Judgment affirmed.   All the Justices concurring.*