# JOHN B. LAWRENCE *vs.* THE STATE OF MARY- LAND.

*Conspiracy to Defraud—Admissibility of Evidence—Statements Made by Third Party in the Interest of the Conspirators—False Pretenses—Cross-examination of the Accused When a Witness—Admissibility in Evidence of Papers taken from the Possession of the Accused.*

Upon the trial of an indictment for conspiracy, the acts and declarations of each co-conspirator, made during the progress of the conspiracy and in furtherance of its object, are admissible in evidence against the others, provided the fact of the conspiracy has been established by *prima facie* evidence. But it is within the discretion of the trial Court to admit in evidence the acts or declarations of one conspirator before the conspiracy itself has been sufficiently proved, when the prosecution undertakes to furnish such proof subsequently.

The first count of an indictment against L, H and V charged them with a conspiracy to defraud one Rose, and the second count charged ame

parties with having obtained money from Rose by certain false pretenses relating to mining stock which Rose was induced to buy from L. One B, a third party, made statements to Rose about the mining stock in the presence of H, one of the traversers, and B participated in the efforts of H and V to interest Rose in the stock. *Held*, that evidence of these statements made by B was admissible against H and was also competent evidence against the other traverser when followed by proof of the conspiracy charge.

But statements made by such third party to the prosecutor not in the presence of any of the traversers are not admissible in evidence.

On an indictment for conspiracy, statements made by one of the conspirators after the object of the conspiracay had been accomplished are not admissible in evidence against the other conspirators.

When parties are charged with obtaining money by false representations as to mining stock, which they induced the prosecuting witness to buy, evidence is admissible to show that a pretended sale of the same stock was made to a third party in the presence of the prosecuting witness as an incentive to lead him to buy a like amount, and evidence is also admissible as to statements made at the time by such third party as a part of the *res gestae.*

But evidence as to statements made by such third party not in the presence of the traversers is incompetent.

When a party charged with false pretenses in the sale of worthless mining stock is a witness in his own behalf, he may be cross-examined as to matters tending to show his knowledge of the worthlessness of the stock and all the circumstances of the transactions, without regard to the extent of the direct examination.

After the arrest of the defendant on the charge of obtaining money by false representations as to mining stock which he induced the prosecuting witness to buy and pay for, a detective obtained from the hotel at which the defendant had stopped his valise containing certificates for 16,500 shares of the same stock, and a bogus certificate of deposit of the Chicago Land and Trust Company for $5,000, which the defendant had accepted in payment of stock which he had sold to a third party in the presence of the prosecuting witness. At that time the defendant had stated that he had only 14,500 shares of stock. At the trial upon an indictment charging conspiracy to defraud a designated person in the first count and obtaining money from him by false pretenses in the second count, the prosecutor offered in evidence the contents of the defendant's valise "to prove the conspiracy to unload stocks on the people here." *Held*, that this evidence is not admissible to prove the conspiracy charged in the indictment, but was admissible upon the second count to contradict defendant's statements as to the amount of stock held by him and to show his guilty knowledge of its lack of value, and it is not necessary for the prosecution to first prove that the stock has no value.

In order to show that the above-mentioned certificate of deposit was worthless, evidence of a police officer of Chicago is admissible to show that he had made an investigation of the alleged trust company and had seized its papers, including certificates of deposit like the one in question, that the name signed to it was fictitious, and that the trust company was not in existence at the time the certificate purported to have been issued.

The fact that documents and chattels have been illegally taken from the possession of an accused party does not render them inadmissible in evidence against him, on the ground that they were taken in violation of his constitutional right to security against unlawful search or seizure of his property. If such documents are competent evidence the Court will not inquire as to the means by which they were procured.

Appeal from the Criminal Court of Baltimore City (STOCK-BRIDGE, J.)

The cause was argued before McSHERRY, C. J., BRISCOE, BOYD, PEARCE, SCHMUCKER, JONES and BURKE, JJ.

*Thomas G. Hayes, William Colton* and *Richard B. Tippett,* for the appellant.

*William S. Bryan, Jr., Attorney-General,* and *Eugene O'Dunne, Deputy State's Attorney for Baltimore City,* for the appellee.

JONES, J., delivered the opinion of the Court.

The appellant in this case was indicted in the Criminal Court of Baltimore City jointly with one William Hooper and Virginia Hamilton. The indictment consisted of two counts. The first charged that on the 18th of July, 1904, the parties named conspired by divers false pretences to obtain and acquire from John Rose certain moneys and properties and to cheat and defraud him thereof; and in the second count that on said day they, by a certain false pretense, obtained from John Rose five thousand four hundred and fifty dollars current money; also one check dated the 18th day of July, 1904, drawn on the Baltimore Trust Company made payable to the order of the appellant, signed by John Rose, good and valid for the payment of four thousand and fifty dollars current

money with intent to defraud, &c. The appellant was con-
victed upon the second count of the indictment. The two
parties indicted jointly with him were acquitted on both
counts. This appeal is from the judgment rendered against
the appellant upon the verdict so found.

The appeal is based upon alleged errors in the rulings of
the trial Court upon the evidence which are set out in twenty-
two exceptions in the record before us. The issues in the
case, to which the proofs were to be directed, were, under the
first count, whether the parties accused, or any two of them,
had formed a conspiracy to cheat and defraud John Rose—
involving the inquiry first was a conspiracy formed? Sec-
ondly, if so, did it exist with the intent to cheat and defraud
John Rose? 3 *Grcen. Ev.*, sec. 96 (8 ed.) Under the second
count, whether said parties, or any of them, made such false
and fraudulent representation of an existing or past fact as to
constitute the false pretense alleged and employed such false
pretense to defraud? 2 *Bish. New Crim. Law*, secs. 415 and
471. In determining the admissibility of evidence regard is
to be had both to the nature and character of the evidence
adduced, as respects its pertinency to the issue to be decided,
and to the means and instruments through which it is fur-
nished.

As affecting questions presented by some of the exceptions
now coming under consideration it may be premised that upon
a charge of conspiracy, such as is involved in the first count
of the indictment here in question, the acts and declarations
of each co-conspirator made during the progress of the exe-
cution of the object of the conspiracy, and in furtherance of
such object may be given in evidence against all the others;
but as a general rule "a foundation must first be laid, by proof,
sufficient in the opinion of the judge, to establish, *prima facie*,
the fact of conspiracy between the parties, or proper to be
laid before the jury, as tending to establish such fact * * *
Sometimes for the sake of convenience the acts or declarations
of one are admitted in evidence, before sufficient proof is given
of the conspiracy; the prosecutor undertaking to furnish such

proof in a subsequent stage of the cause. But this rests in the discretion of the judge and is not permitted, except under particular and urgent circumstances; lest the jury should be misled to infer the fact itself of the conspiracy from the declarations of strangers." 1 *Green. on Ev.*, sec. 111. See also 3 *Green. on Ev.*, sec. 92. This doctrine has been illustrated in many cases in which the general rule' stated, and its qualifications have both been recognized. We need refer to none of these, however, other than that of *Bloomer* v. *State*, 48 Md. 521, in which this Court fully recognized the rule and the qualification as stated in the learned author just cited. In that case, which was one involving only the charge of conspiracy, the Court said: "Before any act can be evidence against a man, it must be shown to be an act done by himself, or another, acting by his authority, or in pursuance of a common design;" and then proceeded to state the qualification of the rule which has been noticed, concluding with a quotation from 1 *Taylor on Ev.*, 540, that "on this subject it is difficult to establish a general inflexible rule, but each case must in some measure be governed by its own peculiar circumstances." The Court then approved of the action of the Court below in that case in admitting evidence of an act of an alleged co-conspirator before the *prima facie* case of conspiracy had been shown, when coupled with the requirement that the State would have to prove, before the traversers could in any way be held responsible, that they conspired and agreed together to do the improper act, and "that it was done by conspiracy."

In conspiracy the question is one of participation in design; but "it is not necessary to prove that the defendants came together and actually agreed in terms to have that design and to pursue it by common means. In nearly all cases a conspiracy must be proved by circumstantial evidence, that is by the proof of facts from which it may be fairly implied that the defendants had a common object, and that the acts of each, though they may be different in character, were all done in pursuance of a common end and calculated to effect a common purpose. It must be made to appear that the parties steadily

pursued the same object, whether acting separately or together, by common or different means, all leading to the same unlawful result. Concurrence of action on a material point is sufficient to enable a jury to presume concurrence of sentiment, and from this the actual fact of conspiracy may be inferred." *Wright on Criminal Conspiracies with American Cases by Carson*, 212. See also 3 *Green. on Ev.*, sec. 93 (8 ed.); 8 *Cyc.*, 621–2, 685. It may be said in addition to the above that the acts and declarations of a co-conspirator, to be received as evidence, against others confederating with him "must occur during the life of the combination, that is after the formation and before the consummation or abandonment of the object of the conspiracy." 8 *Cyc.*, 680–81.

The questions presented by the exceptions will now be considered. In the first of these it appears that the prosecuting witness Rose testified that he, about two years previously, had met the traverser Hamilton, and had since met her about a dozen times; that she talked to him about gold mines and about Mr. Hooper, who she said was an agent of gold mines; that on the 12th of July, 1904, he met her on Franklin street, Baltimore, when she stopped and chatted with him and commenced on the old subject of gold mines; that while they talked two gentlemen came down the street and she said, "there is Mr. Hooper," and she then introduced him to Mr. Hooper; after a little talk he left and next saw Mr. Hooper (one of the traversers) on the 13th of July when he came, with a man by name of Bell, to witness' boarding house; they asked him if he had any Cripple Creek Temple Gold Mining Stock. Witness was then about to state what the man Bell had said, beginning with "this Mr. Bell made a special point" when counsel for traverser (Lawrence) objected to the declaration of Bell. The Court overruled the objection, remarking that the evidence was admissible as far as the traverser, Hooper, was concerned, and that as to its possible effect on the others it was difficult then to see whether it would "be evidence tending to establish the conspiracy;" and as to these others the evidence would be admitted "subject to be stricken out if it is not fol-

lowed up." The witness then went on to state when "they" asked him about the stock mentioned he told them he was very much surprised; that he had never had any stock of the kind, and "they said they positively understood that he had." "They" further said, "here is a matter that is of considerable interest to you;" and told him of the mine in Colorado; that Bell stated "he was a lawyer by profession and was an agent of a syndicate, and he was looking for all the stock of this Cripple Creek Temple Gold Mining Company;" that the reason they wanted him (Bell) as agent was that "these big fellows were after" the mine—"they wanted to gobble it up;" and explained what had been done to conceal its value; and wanted witness to come up to "Hazazer's Hall," where from other evidence it appears Hooper (traverser) had an office; that witness told them he could not go and gave his reason. The next day a letter purporting to be from Hooper was delivered to him by special messenger at his place of abode.

Before discussing the matter of this first exception that of the fourth and fifth will be noticed. In the fourth counsel for the State (some other testimony having intervened) asked the witness to go back to where Bell and Hooper left his house after the conversation he had narrated and asked him "how did you come to go to Rennert's hotel?" The witness was proceeding to say "this man Bell, and Hooper being present" told him "that a man by the name of Lawrence (meaning the appellant) when objection was made on behalf of appellant and the Court permitted the evidence to be given which was to the effect that what was told him was that Lawrence (appellant) had a lot of "Cripple Creek Mining Stock," and that if witness would go up there "they" would show him "this man who had this stock," that he told them he "could not go on the 14th but they came again—this man Bell came again in the evening and beckoned me to see." Witness then stated that he "went with Bell to the hotel, the Rennert Hotel" and met the traverser, Lawrence, and was asked "what conversation took place between you—what did you do when you met in the Hotel Rennert?" And the witness was pro-

ceeding to say "this man Bell said" when counsel for appellant objected on his behalf but the Court permitted the evidence to be given which is the subject of the fifth exception. The witness then testified that upon arriving at the hotel, Bell had said to him "see here, I don't want you to go—I don't want to be known to this man, Lawrence   *  · *   *   you call and find whether he is there, and you ask whether he has any Cripple Creek Gold Mining Stock?" Witness did go in and inquire for Lawrence whom he found; and by whom he was told that he (Lawrence) did have the stock mentioned. He then called in Bell who introduced himself to Lawrence as Becker. To the objection to the testimony in the fourth exception, the Court, as we understand from the record, intimated that the same ruling applied as had been made in the first exception.

We do not think the Court committed any error in the rulings in the first and fourth exceptions. As said by the learned Judge below, it was relevant and competent to let this testimony in as affecting the traverser, Hooper. There had been evidence without objection that he was an agent for gold mines. In the connection now being adverted to, there was evidence going to show that he sought Rose for the purpose of interesting him in the mining stock which the State was offering to prove had been used as the means of accomplishing the fraud charged in the indictment; that he knew the appellant (Lawrence) was possessed of some of the stock; and that he was making an effort to bring Rose into communication with Lawrence. There was evidence of his acts to the effect mentioned apart from anything said or done by Bell. Rose was introduced to Hooper by the traverser, Hamilton; and first came into contact with Bell, according to the State's testimony, when Hooper sought the interview at his house, which has been mentioned, having Bell with him. Bell, according to the evidence, there participated in everything that was said and done towards calling Rose's attention to the stock which was the subject of conversation at the interview and commending it to his favor. It is a fair inference that

Bell was there for the purpose of doing this with Hooper's knowledge and acquiesence. He further participated in inducing Rose to get into communication with Lawrence. There was evinced, according to evidence submitted, the common purpose between Hooper and Bell of endeavoring to interest Rose in the stock in question and of bringing him into contact with Lawrence. It is inferable that Bell was an instrument for the working out of these purposes. Under the circumstances the declarations of Bell in connection with the acts in question were just as much a part of the *res gestae* as going to explain and give color to the acts as were those of Hooper. The testimony in question was relevant in itself, as against Hooper, as a step in showing the common purpose of the parties named in the indictment as charged in its first count and the connection of Hooper therewith; and having been admitted only as affecting Hooper under that count and not to affect the other traversers unless followed up so as to show their connection with the conspiracy charged, the appellant cannot complain.

There was error however in admitting the evidence objected to as shown in the fifth exception—that is conversation between Rose and Bell which took place upon the steps of the hotel and prior to the commencement of the interview between Rose, Lawrence and Bell. This having occurred out of the presence and hearing of Hooper was not evidence against him. It was not, in itself, evidence against any of the traversers under either count of the indictment and it was admitted without qualification. We are not able to say the appellant may not have been prejudiced by it and his objection ought to have been sustained unless it could be shown how it was to be made relevant.

There was error also in admitting the evidence in the second and third exceptions. In both of these the witness was allowed to detail conversations or rather a conversation he had with Miss Hamilton, one of the traversers, on the 18th of July, 1904, which was after the conspiracy charged, and which the State had made the object of its proof, had, accord-

ing to the theory of the prosecution, been consummated. It has been seen that the acts and declarations of a co-conspirator made after the consummation of the conspiracy are not to be received as evidence against other parties to the alleged combination. The suggestion is that it was competent testimony as against the party with whom the conversation was held; and it might be as going to show the connection of such party with a conspiracy otherwise established against the appellant. It was admitted, however, without condition or limitation against the appellant's objection and so could be used in the case against him under both counts of the indictment; whereas, as against him, when objected to, it was not competent evidence under either count. It is not within the rule of practice that when an offer of evidence is objected to generally the evidence will be admitted if competent for any purpose. As to the appellant it was competent for no purpose and so he was in the same position as if the indictment had been against him alone.

There was no error in the ruling in the sixth exception. At the interview to which reference has been made as taking place between Rose, Lawrence and Bell, Lawrence professed to have 14,500 shares of Cripple Creek Temple Gold Mining Stock which he had inherited from an uncle and which was deposited with a depository in the city of Baltimore; and said that he would sell 10,000 shares at one dollar a share. No sale was consummated at this interview, but it was arranged for the three parties then present to meet on the next day, the 14th of July. They met accordingly and Lawrence produced the 14,500 shares of the stock when Bell told Lawrence in the presence of Rose that he (Bell) would take 5,000 shares of the stock if Rose would take 5,000. To the admission of this evidence the appellant's counsel objected. The theory of the State, we presume, was that this offer of Bell to buy stock was a ruse understood between Bell and the appellant, and intended to induce Rose to buy stock which the State proposed to show was worthless, and the sale of which to Rose was the fraud by which he was deprived of his money.

This was competent evidence under the second count in the indictment as a step towards showing a scheme of fraud culminating in the transaction which the State put in evidence as the false pretense charged; and it became connected with other evidence that gave it much significance in this regard.

The same considerations that apply to the exception just discussed apply to the next, the seventh exception. The question in this last-mentioned exception to which the objection of the appellant was made was "What was it that Bell was persuading Lawrence to go to Philadelphia, what was the object of that mission—what language did Bell use as to why he wanted him to go to Philadelphia?" It will be observed that the question related to a conversation between Bell and Lawrence in the presence of Rose. The latter had testified that, after Bell had said he would buy 5,000 shares of the stock, &c., if Rose would buy 5,000 shares, Bell took the 5,000 shares and paid for it with a "certificate" which the witness, at the time, was unable to identify, but which from subsequent proof was shown to be a certificate of deposit of the "Chicago Loan and Trust Company," and Lawrence accepted the certificate in payment for the stock that Bell bought. The witness then went on to state "I then took them 5,000 shares, and then he said, now if you will take an option on the 4,500 shares, I think that would be a splendid thing, because tomorrow we go to Phiadelphia, and we get the money according to dispatches" —— then to state further "when I took the option he prevailed upon me to take the balance of the stock, the 4,500 shares, and he said now you will get this money if you will advance ten per cent on it which will make $450—and you get the money tomorrow if you will be there." Asked if he put up the ten per cent he said yes, "consequently I gave a check to him for $5,450," and further testified that Lawrence would not accept a check but wanted the money and they went out to get the check cashed; and that while they were talking to him "Bell prevailed upon Lawrence to go to Philadelphia with him; that Lawrence said he did not want to go and Bell offered to

pay his expenses when he consented to go. Witness was then
asked "what did he want to send him to Philadelphia for,"
and answered "about the balance of the stock, the option and
one thing and another"—and further testified that he gave
the check so as to include the amount of his contract of pur-
chase of the 5,000 shares of stock and the advance on the op-
tion for the 4,500 shares—making the check $5,450. The
record, in the manner of setting out the foregoing testimony,
is a little confusing and does not make the relations of the
parties, Bell and Lawrence, to the statements made to the
witness Rose with respect to going to Philadelphia entirely
clear.   Enough appears however to show that the parties
named were together for the purposes of the transaction that
the witness described, and which the State was offering to
show constituted the false pretense charged in indictment; that
the going to Philadelphia was talked of in the presence of all
three; and that the going to Philadelphia had connection with
the purposes of the transaction for which they had met.
What was done and said between the parties, when they
had met, in relation to the transaction or their purposes in that
connection or to the carrying out of the same, was clearly
part of the *res gestae* and tended to throw light upon, explain
and determine its character.   All parties concerned with the
transaction had the right to this explanation.   This was what
the inquiry which is the subject of the exception now under
consideration sought to elicit; and it was pertinent to the
charge under the second count of the indictment and tended to
reflect upon how far the charge therein as against the appel-
lant was supported by the transaction in proof.

In the eighth exception the witness Rose was asked if Miss
Hamilton was the first one who had spoken to him about the
mining stocks and he was allowed to answer against objection
by the appellant.   The question was fully answered in other
testimony in the cause without objection.   The appellant could
sustain no injury therefore from the ruling made and no ma-
terial inquiry is therefore presented here under that ruling.   In
the ninth exception the same witness was asked what, upon

the occasion that Bell and Hooper were both present at wit-
ness' house, Bell had said about flooding the mines. This
occurred in the conversations to which witness had testified
under the ruling in the first exception and what was said in
considering that exception disposes of this. In the tenth ex-
ception the witness was asked "it was Davis who was to give
you this money in Philadelphia?" No connection appears or
was offered to be made to appear between the appellant and
the matter of inquiry and the question was obnoxious to the
objection he made. It was said in argument that the question
had been answered on cross-examination without objection.
The record does not show this.

In the eleventh exception the witness was asked how he
knew it was Davis who was to give him the money in Phila-
delphia, and whether either Bell or Lawrence told him so in
the presence of each other. Against appellant's objection he
was permitted to answer and said he got this from Bell, where-
upon the appellant moved to strike out the evidence and the
Court overruled the motion. This ruling is the subject of the
twelfth exception. The motion should have prevailed for the
reason appearing in disposing of the tenth exception. In this
connection exceptions 19, 20 and 21 may be disposed of. The
rulings in these exceptions are not obnoxious to the objections
made to them. The appellant was testifying as a witness in
his own behalf, and on cross-examination he was asked (19th
exception), "Did you meet a man by the name of Davis in
Philadelphia?" Again (20th exception), "Have you ever been
in the office of Halter & Hirshfield?" This was a firm of
brokers in Philadelphia that had been spoken of in the evi-
dence, and in connection with the visit to Philadelphia of Bell,
Lawrence and Rose to which there has been occasion to refer
heretofore. In the 21st exception attention was called to the
name of Davis on a certificate of the Cripple Creek Gold Min-
ing Company stock which had been in appellant's possession;
and counsel for the State said, "let us see whether he is the
same Davis of that family." This was proper cross-examina-
tion. The appellant was a witness and had undertaken to

give an account of, and explain the whole transaction involved in the charge against him.   In the course of his examination-in-chief he had had his attention especially called to the trip to Philadelphia and was asked for his account of it.   He admitted having in his possession other stock, of the same kind as that which he sold to Rose, at the time of his arrest; and testified that he did not know, and had no reason to believe that the stock at the time he got it and when he delivered it "was not perfectly good as its face would indicate."   Thus was opened up a wide field of inquiry upon cross-examination involving not only the circumstances of the transaction, but the questions of *bona fides* and guilty knowledge.   When looking at the whole subject-matter of the testimony of the appellant as a witness, the inquiries indicated in the exceptions under consideration were sufficiently germane thereto to make them in any event legitimate cross-examination.   But even if his examination-in-chief had been more restricted this Court in *Guy* v. *State*, 90 Md. 29, laid down the rule "that when the accused voluntarily becomes a witness in his own behalf 'he may be cross-examined concerning any matter pertinent to the issue on trial, regardless of the extent of the direct examination.'"   Somewhat similar inquiries of the State's witnesses, which the Court had disapproved, differ essentially from those on the cross-examination of the appellant.   The former did not show nor tend to show any connection of the appellant with the matters inquired of.   The inquiries of him as a witness involved directly his connection with the subject of inquiry.

In connection with the 13th exception, the 16th, 18th and 22nd may be considered.   They are all in substance, the same, only differing in the form in which the single question they raise is presented.   When the appellant was arrested on the charge in the indictment he was taken to detective headquarters in Baltimore City.   He had been to a hotel in the city and left there a satchel.   The chief of the detective department sent to the hotel and had the satchel brought in.   According to the testimony of the officials they opened the

satchel and found in it and took from it a certificate of deposit
of the Chicago Loan and Trust Company, 29 Wyoming Coal
Bonds and 16,500 shares of Colorado Gold Temple Mining
Company stock evidenced by four certificates.    According to
the testimony of the appellant these articles, with the excep-
tion of the coal bonds which he says were in the satchel, were
taken from his person.    The certificate of deposit and the four
certificates of Colorado Gold Temple Mining Company Stock
were offered in evidence by the State, and admitted by the
Court over the objection of the appellant.    The admissibility
of this evidence is the question presented by the exceptions
now under consideration.    The record in presenting the matter
of these exceptions is again lacking in clearness as to what the
precise ruling was.    When the State was producing the con-
tents of the satchel in evidence counsel for the appellant asked
what it was offered to prove, to which counsel for the State
responded "to prove the conspiracy to unload stocks on the
people here."    There was objection to the offer followed by
argument after which the Court admitted the evidence.    This
evidence was not admissible for the purpose stated in making
the offer of it.    That purpose was stated to be "to prove the
conspiracy to unload stocks on the people here."    The con-
spiracy which the State was called upon to prove under the
indictment was a conspiracy with the specific intent to defraud
John Rose.    Evidence to prove another conspiracy was not
admissible under this indictment.    3 *Green. Ev.*, sec. 96, and
references; *Russell on Crimes* (9 ed.), p. 279 (marg.)

It is not necessary to inquire whether the evidence, in itself,
tended to prove conspiracy at all; for if it was admitted for
the purpose for which it was offered it would not seem to be
reversible error because the evidence was admissible under the
second count of the indictment; and as the appellant was ac-
quitted under the conspiracy count and was convicted under
the second count he sustained no injury by reason of the rul-
ing.    It was admissible under the second count because the
State's proof showed that the appellant at the interview at the
hotel at which he made the sale of the stock to Rose had

stated that the 14,500 shares was all of the stock that he had; that 10,000 shares of this was his own and the balance belonged to his sisters; and that the stock had been inherited from his uncle. Assuming his statements in the regard mentioned to be true it tended to show that he was innocently in possession of the stock and that he might be unaware of its being without value even if such was the case. The having this other stock, found upon him, in his possession, and being carried around carelessly in a satchel which he had left, without, as far as appears, having provided for its safe custody in his absence, in a public hotel, tended to contradict and falsify his statements; and was evidence going to show guilty knowledge.

As to the possession of the certificate of deposit there was significance in his still having that in his possession and being apparently satisfied with it as a payment for the stock purchased by Bell who, he would have it appear, was an entire stranger to him; when he was not content to take a check from Rose, whom he must have believed to be pecuniarily responsible; but demanded the cash for the stock purchased by the latter, and was at the bank as promptly as was practicable to collect the check which Rose gave to close the option on the 4,500 shares. It is argued that as respects the stock embraced in the offer of evidence under consideration the evidence was not admissible until the State had *first* proved that such stock had no value. The worthless character of the stock in question was one fact to be proved by the State as having relevancy to establish the charge in the indictment. The possession of the stock by the appellant was another fact of like relevancy. The relevancy of these facts to the issue did not depend on the order in which they were proved. That was immaterial. Each was in itself pertinent to the issue and for that reason alone was admissible. Neither depended, for its relevancy, on the other having been previously proved.

The main contention however against the admissibility of the evidence set out in the exceptions under consideration is, that the articles offered in evidence, whether they were taken

from the satchel as the officers testified, or from the person of
the appellant after he was under arrest as he testified, were so
taken in violation of his constitutional right to security against
unlawful search, and seizure of his property; and the produc-
tion of them in evidence was, under the circumstances, a com-
pulsion upon him to give evidence against himself—reliance
being had for this contention on the Fourth and Fifth Amend-
ments to the Constitution of the United States and Article 22
of our Bill of Rights.   The incriminatory effect of the appel-
lant having the articles in question in possession arose from
the relevancy of this as evidence to prove the issue.   The
objection could only go to the manner of its production.
That being so it would seem upon reason and the great pre-
ponderance of authority that the manner in which the State
secured control of these articles did not make them inadmis-
sible in evidence upon the ground last referred to.   The true
effect of the constitutional provisions, here invoked against
the admissibility of the evidence in question has been declared
by the Courts to be that they are inhibitions upon govern-
mental action; and intended to prohibit legislation that may be
oppressive to the citizen by subjecting him to vexatious and
unreasonable search and seizure of his property, and compell-
ing him, when accused of crime, to give evidence against him-
self; as also to restrain the Courts from making use of their
process to vex and oppress him in like manner.  That they have
no application to the irregular and unlawful acts of individuals.
In the recent and valuable work on Evidence of Professor Wig-
more it is affirmed, upon an exhaustive and discriminating review
of the authorities, that it is universally conceded that chattels
and documents in the possession of an accused party are·
within the protection of the constitutional provisions in ques-
tion, if sought to be produced in evidence through process
against him as a witness; but if obtained from him otherwise
than by the use of such process they are not within the priv-
ilege which these provisions confer.   4 *Wigmore on Ev.*, sec.,
2264.   In 1 *Greenleaf on Ev.*, sec. 254 (a) it is laid down that
"though papers and other subjects of evidence may have been

illegally taken from the possession of the party against whom
they are offered, or otherwise unlawfully obtained this is no
valid objection to their admissibility, if they are pertinent to
the issue.    The Court will not take notice of how they were
obtained, whether lawfully or unlawfully, nor will it form an
issue to determine that question." This statement of the law
in Greenleaf is to be found frequently quoted and approved
by the Courts; and in decisions of recent date.    To the same
effect is the statement of the law in recent publications; 25
*Am. & Eng. Ency. of Law*, 154–5 and 12 *Cyc.*, 402, with co-
pious references to decisions throughout the country to sup-
port the proposition which they affirm.

The counsel for the appellant place much reliance on *Boyd
v. United States*, 116 U. S. 616, to support the contention
they make.    In that case the United States Supreme Court
had under consideration the constitutional validity of certain
provisions of the revenue laws of the United States which con-
ferred upon the Courts the power, when parties were indicted
for their infraction, on motion of the prosecuting attorney, to
require such parties to produce in Court their private books,
invoices and papers, which if they refused to do, the charges
against them were to be taken as confessed.    The Court held
such legislation to be unconstitutional and void.    Whatever
may have fallen from the Court in that case in the course of
its reasoning or may appear as *obiter* in the opinion, it would
seem to be manifest that it was dealing with a very different
question from the one involved in the case at bar.    The Court
there was not dealing with the irregular or unlawful acts of
individuals, if we assume the acts complained of here to have
been of this character.    It was dealing with the powers of gov-
ernment.    It was dealing with an act of legislation which con-
ferred upon the Courts the power to use its process directly
against the accused to compel him to furnish what would give
evidence against him under the penalty of having the accusa-
tion taken as true in case of his refusal to produce such evi-
dence.

The counsel for appellant also rely upon the case decided

by this Court of *Blum* v. *State*, 94 Md. 375. There again the question as to the admissibility of the testimony which the Court had under consideration had reference to evidence produced under process from the Court. The process under which the prosecution obtained the control of the books and papers which were there offered in evidence was not issued direct from the Court, and in the proceeding in which such offer was made; but were produced from the custody of receivers who had possession of them by virtue of an order of Court in a civil proceeding. This was treated as being virtually compulsory process for the production of the evidence in the immediate proceeding in which it was offered. The whole argument upon the question of the admissibility of the evidence was to show that the evidence was produced under what must be considered compulsory, legal process, and the conclusion as to this was stated in the following language: "The effect of the order upon the admission of the books in this case can have no other or greater effect than an express order directed to the traversers, if there were no receivership, commanding them to produce these books and papers to be used in evidence for the State."

It has been made very clear that the Supreme Court of the United States has not placed upon *Boyd* v. *United States*, *supra*, the interpretation that counsel for appellant here seek to give it. In the recent case of *Adams* v. *New York*, 192 U. S. 585, it appeared that officers made a raid of a policy shop and, besides policy slips, took into possession private papers found on the premises which at the trial of the case were offered and admitted in evidence against objection by the accused. Upon appeal to the Supreme Court this was affirmed—that Court saying that the evidence was clearly competent in itself, and that "in such cases the weight of authority as well as reason limits the inquiry to the competency of the proffered testimony, and the Courts do not stop to inquire as to the means by which the evidence was obtained"—and citing the passage from 1 *Green. Ev.*, *supra*, which the Court said was supported by numerous cases. The

opinion then referred to and cited approvingly from *Com.* v. *Dana*, 2 Met. 329, in which it is said that though a "search warrant was illegal, or if the officer serving· the warrant exceeded his authority   *   *   *   this is no good reason for excluding the papers seized as evidence if they were pertinent to the issue;" and from *Com.* v. *Tibbetts*, 157 Mass. 519, where an officer had found criminatory 'articles and letters which were offered in evidence, and objected to because the officer was acting under a warrant to search for intoxicating liquors and had no warrant to search for the articles offered in evidence, and the Court said "the defendant contends that under such circumstances the finding of criminating articles or papers · could only be proved when by express provision of the statute the possession of them is itself made criminal. ˙ This ground of distinction is untenable.   Evidence which is pertinent to the issue is admissible although it may have been procured in an irregular or even an illegal manner."   ·

The opinion in the case now being reviewed then takes up the case of *Boyd* v. *United States, supra,* and after noting that the Supreme Court of New York in the case then at bar, and in which the defendant had been on trial "was not called upon to issue process or make any order calling for the production of the private papers of the accused," and referring to the˙discussion of the constitutional˙ provisions under consideration in the case of *Boyd* v. *United States,* it says, "but the contention is that if in the search for instruments of crime other. papers are taken the same may not be given in evidence   *   *   * We think they (the constitutional provisions) were never intended to have that effect, but are rather designated to protect against compulsory testimony from a defendant against himself in a criminal trial, and to punish wrongful invasion of the home of the citizen or the unwarranted seizure of his papers and property, and to render invalid legislation or judicial proceedings having such effect."   It is unnecessary to review the many cases which go to support the views already indicated upon the question under consideration.   References to them will appear from the citations made.   As cases of especial per-

tinency we may note *Gindrat* v. *People*, 138 Ill. 103; *Trask* v. *People*, 151 Ill. 523–9; *Williams* v. *State*, 100 Ga. 511; *Shields* v. *State*, 104 Ala. 35; *State* v. *Griswold*, 67 Conn. 290; *State* v. *Edwards*, 51 West Va. 220, 40 S. Car. 363 (*State* v. *Atkinson*); *Chastang* v. *State*, 83 Ala. 29; *Starchman* v. *State*, 62 Ark. 538; *State* v. *Pomeroy*, 130 Mo. 489; *State* v. *Flynn*, 36 N. H. 64.   To these may be added a case cited and relied upon by the appellant, *State of Iowa* v. *Height*, 117 Iowa, 650, in which the Court held that the result of an enforced examination of the traverser to determine whether he had a certain disease which would tend to connect him with the crime with which he was charged was not admissible as evidence against him; but said in the course of the opinion in the case "there are, of course, limitations as to immunity from search and seizure for the purpose of securing evidence of crime.   It is well settled that when one charged with an offense is arrested, the officers may, without further legal procedure, seize weapons with which the crime had been committed, property which has been obtained by means of the criminal act, or articles which may give a clew to the commission of the crime or identification of the criminal."   In the view taken of the question which has just been considered it has not been thought necessary to advert to the fact, appearing in this case, that the appellant took the stand as witness in his own behalf, and testified as to the matters embraced in the exceptions that presented such questions, and consider how far such fact might be held as a waiver of the privilege that the appellant therein insisted upon.

It remains now to consider the 14th, 15th and 17th exceptions.   These all relate to evidence going to identify and show the character of the certificate of deposit of the Chicago Loan and Trust Company found in possession of the appellant, and given to him by the man Bell in payment for 5,000 shares of stock professedly sold to Bell at the same time that the transaction with Rose took place which is the subject of the charges in the indictment.   There can be no doubt that this evidence was offered for a legitimate object.   The question can only be

as to the means and the instrumentality of the proof.   The
testimony was given by a witness called by the State who testi-
fied that he was a police officer in Chicago; that he knew of the
Chicago Loan and Trust Company; that it had existed up to
January 1st, 1904; that on complaint he had gone to the office
of this company and seized the check-book and other papers
there and they were then in Court; "and about $2,500,000
worth of bogus bonds and securities;" that he made an inves-
tigation; that he knew the man (whose name was Jacobs) who
ran the place; that he was now in the penitentiary at Joliet;
that Jacobs was the president of the company; that he was
sent to prison "after using the mails for fraudulent purposes,
using those checks and other evidence, he being a promoter of
various wild cat insurance companies;" that what he, witness,
spoke of as checks were certificates of deposit.   Then the State
offered to put the checks in evidence as being identical in every
particular in form with the certificate of deposit found in ap-
pellant's satchel, and the Court permitted the evidence to be
given.   The counsel for appellant had indicated an objection
to the whole of this evidence.   The 14th exception was to
allowing this evidence to be given and to the testimony that
had been offered.   We need not determine whether each par-
ticular item of the testimony in question was admissible.   The
objection to the whole of the testimony could not prevail if
any of it was admissible.   *Scarlett* v. *Academy of Music*, 46
Md. 132.   There was in the testimony given by the witness
sufficient to lay the foundation for the admission of the papers
for the purpose for which they were offered.

The witness then further testified that he knew Jacobs was
E. M. Chamberlain; that he was president of the bank; that
he was familiar with Jacob's handwriting; that the certificate
in evidence was in the handwriting of Jacobs, although it
reads E. M. Chamberlain; that there was no E. M. Chamber-
lain & Co.'s office in Chicago; that Jacobs operated under the
name of E. M. Chamberlain at 152–154 East Lake street,
where he gathered the certificates in question; that he exam-
ined some 2,000 to 3,000 Jacobs' signatures and was familiar

with them; that a certificate of deposit book which witnesses produced in Court was one that he had taken when he seized the books and papers as he had already testified; that the bank was not in existence when the certificate of deposit found in appellant's satchel was issued or purported to have been; that the dates on the stub in the certificate deposit book corresponded exactly with the dates, number, amount and name in the certificate of deposit exhibited to him—being the one taken from appellant's satchel. After some further testimony by the witness in reference to what he had found when he went to the office of the Chicago Loan and Trust Company and seized papers in which he said that the stubs of the certificates footed up about three-quarters of a million; and that he found the certificates were being used throughout the United States. The State offered the certificates of deposit and stub certificate book of the Chicago Loan and Trust Company in evidence and they were admitted against the objection of the defendant. This testimony was properly admitted as going to identification and character of the paper purporting to be a certificate of deposit found in the possession of the appellant. This disposes of the fifteenth exception.

In the seventeenth exception it is shown that this witness was asked to look at the book which he said was the only book that he found kept by Jacobs in regard to deposits made in the Chicago Loan and Trust Company and which he had in Court and to say whether there was there "a single entry of a dollar deposited to meet those." There was no injury to the appellant from an answer to this question. It involved no expert knowledge. The witness had the book before him and he had only to use his eyes to make answer to the question. The book could have been exhibited to the jury if there was anything in it to contradict the witness or to show that the state of entries made the evidence of the witness unreliable. Having disposed now of all the exceptions we feel constrained to reverse the judgment against the appellant for

the errors in the rulings in the 2nd, 3rd, 5th, 10th, 11th and 12th exceptions.

*Judgment reversed and new trial awarded.*

(Decided January 24th, 1906.)