STATE OF IOWA, Appellee, v. HENRY TONN, Appellant.

**CONSPIRACY: Indictment—Overt Acts.** An indictment for conspiracy to commit the crime of criminal syndicalism (as defined by Ch. 382, 38 G. A.) need not allege overt acts.

**CRIMINAL LAW: Evidence—Evidence Wrongfully Obtained.** Evidence which is pertinent and relevant is admissible against the defendant in a prosecution for crime, even though the same was secured *by an unlawful search of defendant's premises.*

PRESTON, C. J., and WEAVER, J., dissent.

**CRIMINAL LAW: Evidence—Waiver in re Evidence Wrongfully Obtained.** An accused may waive his right (conceding, *arguendo,* that he has such right) to object to evidence on the ground that it was obtained by reason of an unlawful search of his premises.

So held where property so unlawfully obtained was tendered to the accused, and he declined to receive it.

CRIMINAL LAW: Evidence—Return of Evidence Unlawfully Obtained. An indicted accused may not, on formal application to the court, compel the return to him of pertinent and relevant testimony which has been obtained from him by an unlawful search of his premises.

PRESTON, C. J., and WEAVER, J., dissent.

CRIMINAL LAW: Evidence—Result of Investigation. On the trial of an indictment for conspiracy to commit criminal syndicalism, a witness who has made a special investigation and study of the principles and purposes of an organization named in the indictment may testify as to the results of his said investigation.

CRIMINAL LAW: Evidence—Materiality—Letters of Accused. On the issue whether an accused under an indictment for conspiracy to commit criminal syndicalism was connected with an organization which advocated criminal principles, a letter from said organization to the accused, on which letter the accused is shown to have acted, is admissible for what it is worth.

INSURRECTION AND SEDITION: Criminal Syndicalism—Evidence. On the issue as to the teachings and principles of an organization (with which it is alleged that the defendant in a criminal prosecution was criminally associated), the testimony as to such teachings and principles may cover a period of time *antedating the passage of the law under which defendant is being prosecuted.*

CRIMINAL LAW: Instructions—Absence of Evidence in re Reasonable Doubt. It is error (though not necessarily reversible error) for the court inferentially to base a reasonable doubt on the facts and circumstances which are shown *in the evidence.*

CRIMINAL LAW: Instructions—Jury as Judge of the Law. Instructions reviewed, and held not subject to the vice of making the jurors the judges of the law.

INSURRECTION AND SEDITION: Criminal Syndicalism—"Sabotage" Defined. A definition of "sabotage" which fails to embrace the elements of (1) malice and (2) injury to property is prejudicially erroneous.

CRIMINAL LAW: Instructions—Undue Latitude to Jury. On the trial of an indictment for conspiracy to commit criminal syndicalism, it is reversible error for the court to give to the jury the broad latitude of determining whether the principles and teachings of an organization were such that *"no injurious consequences can reasonably be apprehended."*

**CONSPIRACY: Persons Liable.** Principle reaffirmed that, when one joins a conspiracy, he adopts all the plans and purposes of such conspiracy, and especially when he has full knowledge of such plans and purposes and approves of the same.

*Appeal from Linn District Court.*—MILO P. SMITH, Judge.

## JANUARY 16, 1923.

DEFENDANT was convicted of the crime of conspiracy to commit a public offense, to wit, criminal syndicalism, and appeals.—*Reversed.*

*Harold O. Mulks,* for appellant.

*Ben J. Gibson,* Attorney-general, *John Fletcher,* Assistant Attorney-general, and *H. K. Lockwood,* County Attorney, for appellee.

FAVILLE, J.—Chapter 382 of the Acts of the Thirty-eighth General Assembly defines the crime of criminal syndicalism and prescribes the punishment therefor. Said statute is as follows:

"Section 1. Criminal syndicalism is the doctrine which advocates crime, sabotage, violence or other unlawful methods of terrorism as a means of accomplishing industrial or political reform. The advocacy of such doctrine, whether by word of mouth or writing, is a felony punishable as in this act otherwise provided.

"Sec. 2. Any person who:

"A. By word of mouth or writing, advocates or teaches the duty, necessity or propriety of crime, sabotage, violence or other unlawful methods of terrorism as a means of accomplishing industrial or political reform; or

"B. Prints, publishes, edits, issues or knowingly circulates, sells, distributes or publicly displays any book, paper, document or written matter in any form, containing or advocating, advising or teaching the doctrine that industrial or political reform should be brought about by crime, sabotage, violence or other unlawful methods of terrorism; or

"C. Openly, willfully and deliberately justifies, by word of mouth or writing, the commission or the attempt to commit crime, sabotage, violence or other unlawful methods of terrorism with intent to exemplify, spread or advocate the propriety of the doctrines of criminal syndicalism; or

"D. Organizes or helps to organize, or becomes a member of or voluntarily assembles with any society, group or assemblage of persons formed to teach or advocate the doctrines of criminal syndicalism, is guilty of a felony and punishable by imprisonment in the state penitentiary or reformatory for not more than ten years (10) or by a fine of not more than five thousand dollars ($5,000.00) or both."

The appellant was indicted by the grand jury of Linn County, Iowa, charged with the offense of conspiracy to commit the act of criminal syndicalism. The indictment was brought under Section 5059 of the Code, which is as follows:

"If any two or more persons conspire or confederate together with the fraudulent or malicious intent wrongfully to injure the person, character, business, property or rights in property of another, or to do any illegal act injurious to the public trade, health, morals or police, or to the administration of public justice, or to commit any felony, they are guilty of a conspiracy, and every such offender, and every person who is convicted of a conspiracy at common law, shall be imprisoned in the penitentiary not more than three years."

I. A demurrer to the indictment was interposed by the appellant, and was overruled. It is urged that it should have been sustained. Appellant's chief contention in this regard is that the indictment does not sufficiently comply with Sections 5297 and 5490 of the Code. Said sections are as follows:

1. CONSPIRACY: indictment: overt acts.

"Section 5297. In an indictment for conspiracy, where an overt act is required by law to constitute the offense, the defendant cannot be convicted unless one or more overt acts be expressly alleged therein."

"Section 5490. Upon a trial for conspiracy, a defendant cannot be convicted unless one or more overt acts alleged in the indictment are proved, when required by law to constitute the

offense, but other overt acts not alleged in the indictment may be given in evidence.''

The point urged is that the indictment failed to expressly · allege one or more overt acts.

It is to be noticed that in each of said sections of the statute there is a qualifying clause to the effect that an overt act must be alleged when such overt act is ''required by law to constitute the offense.'' The indictment in the instant case did not charge any such overt act. It did charge that the defendant and divers other persons to the grand jury unknown did conspire, agree, and confederate together, with the fraudulent and malicious purpose and intent to commit a felony, to wit, the crime of criminal syndicalism, by doing the various things which are prohibited by the terms of the said statutes, which said things are detailed and set out *in extenso*.

The indictment is in four counts, conforming to the four paragraphs of Section 2 of said statute.

The precise question now urged by the appellant was before us in *State v. Poder*, 154 Iowa 686, wherein we said:

''The appellant challenges the sufficiency of the indictment, in that it fails to charge an indictable offense, and is void for duplicity. It is said, among other things, that the indictment fails to charge any overt act, and will not therefore sustain a conviction. The objection is unsound. It may be, and doubtless is, true that in some cases the offense of conspiracy is not complete without some overt act, and, when such is the case, the act must be alleged and proved. To this class of cases, Code Sections 5297 and 5490, on which counsel rely, are applicable, but the conspiracy charged in the present case is of statutory creation. See Code Section 5059, which makes it an indictable offense to conspire to do 'any illegal act injurious to public morals.' When, therefore, the accusation is made in the language of the statute and the particular illegal act injurious to public morals, which act is the subject of the alleged conspiracy, is stated, the charge is complete.'' ·

See, also, *State v. Soper*, 118 Iowa 1; *State v. Loser*, 132 Iowa 419; *State v. Rayburn*, 170 Iowa 514, 521; *State v. Madden*, 170 Iowa 230.

The indictment was sufficient, and the demurrer was properly overruled.

II.   On or about the 14th day of November, 1919, the appellant was in the city of Marion, and presented a check made payable to himself, which had been drawn by the officers of the

2. CRIMINAL LAW: Industrial Workers of the World, in the city of
evidence: evidence wrongfully obtained. Chicago.   Some suspicions were aroused from this circumstance, with others, and the appellant was arrested by a deputy sheriff and taken to jail.   At the jail he was searched by a deputy sheriff, who at that time found upon his person a letter addressed to the appellant, purporting to have been written from the headquarters of the Industrial Workers of the World, commonly known as the "I.W.W.," and some small articles of personal use.

After the appellant had been placed in the jail, it appears that the county attorney, without the knowledge of appellant, went to the Royal Hotel in Marion, where the appellant was registered as a guest, and where he had been stopping for a few days, and took from the hotel a suitcase and hand-bag belonging to the appellant, and carried the same to the sheriff's office. The record is not exactly clear as to whether the suitcase and hand-bag were taken from the room in the Royal Hotel occupied by the appellant, or from the lobby in the hotel where the appellant had placed them.   Thereafter, while the appellant was confined in the jail and before a preliminary hearing was had, he was brought to the sheriff's office and the suitcase and hand-bag were then opened in his presence and in the presence of the county attorney and sheriff and two deputies. The contents of the bags consisted of some personal effects of the appellant, including a razor, some wearing apparel, and similar matters, and a very large amount of literature pertaining to the "I. W. W." organization.   At that time, the officers told the appellant to take anything of his personal property in the bags that he cared to take with him, and the appellant then took his razor, brush, hone, and probably one or two other articles.   He was asked if there was anything else that he wanted, and was told, if so, to take it; and he said he "guessed that was all he wanted."   The remaining contents of the two bags consisted of a large amount of books, pamphlets, letters,

buttons, badges, and similar matters pertaining to the organization, principles, and practices of the "I.W.W." These comprised about 225 exhibits, which are set out in the record.

After his indictment, and prior to the trial, the appellant filed in said cause a petition for the return of all of said articles, setting up, under oath, the manner in which he claimed they were taken from him, and praying an order for their return. A resistance to this application was filed by the county attorney, and the petition for the return of the papers was denied by the court. Upon the trial of the cause, the contents of the said two suitcases were offered in evidence by the State. Objection thereto was interposed by the appellant, which was overruled. The appellant insists that the action of the lower court constituted error, both in admitting the exhibits in evidence and in refusing to order their restoration to appellant.

Assuming that the seizure of appellant's said property was without lawful authority, the first pertinent question that arises is whether or not such fact alone rendered the property so taken inadmissible in evidence against the appellant.

A similar question has been before the courts of this country frequently, and it must be conceded that the decisions are by no means uniform on the subject. At an early day, courts and text-writers laid down the general rule that evidence that had been unlawfully obtained from a defendant might be used against him, if relevant and pertinent to the issue being tried.

The rule seems to be general that, where a defendant is personally searched at or about the time of his arrest, property taken from him which is in any way connected with the crime charged or which may serve in identifying the prisoner may be used in evidence against him on a trial. We have recognized such rule. *Commercial Exch. Bank v. McLeod*, 65 Iowa 665; *State v. Lyon*, 176 Iowa 171, 176. It is claimed, however, that the property offered in evidence in this case was obtained by an unlawful search of the *premises* occupied by the appellant, and that a different rule pertains in such a case.

Really, two propositions are involved at this point: (1) Is such evidence inadmissible; and (2) should the court, upon application, order the property so taken restored to the defendant?

The first proposition suggested has been before the courts repeatedly, and with few exceptions the rule has been followed that evidence which is pertinent and relevant is admissible upon the trial of a defendant, even though the same was obtained by an unlawful search of defendant's premises. A few illustrations will show the holdings of various courts on this question.

In *Commonwealth v. Dana,* 2 Metc. (Mass.) 329, an early case, certain lottery tickets had been seized illegally, and were offered in evidence. The court said:

"If the search warrant were illegal, or if the officer serving the warrant exceeded his authority, the party on whose complaint the warrant issued, or the officer, would be responsible for the wrong done; but this is no good reason for excluding the papers seized as evidence, if they were pertinent to the issue, as they unquestionably were. When papers are offered in evidence, the court can take no notice how they were obtained, whether lawfully or unlawfully; nor would they form a collateral issue to determine that question."

The question arose in *Stevison v. Earnest,* 80 Ill. 513, wherein the court said:

"It does not logically follow, however, that the records, being obtained, cannot be used as instruments of evidence; for the mere fact of [illegally] obtaining them does not change that which is written in them."

Again, in *Shields v. State,* 104 Ala. 35, the court said:

"The law appoints the remedy for the redress of the wrong, but the exclusion of the evidence criminating the defendant is not within the scope of the remedy, or the measure of redress. Evidence is not infrequently obtained by methods which are reprehensible in good morals, offensive to fair dealing, subjecting it to unfavorable inferences, the party relying upon it must neutralize, to entitle it to full credence. And evidence is sometimes obtained under circumstances which meet with the unqualified disapprobation of the courts. The evidence, however unfairly and illegally obtained, is not subject to exclusion, if it be of facts in themselves relevant, except when a party accused of crime has been compelled to do some positive, affirmative act inculpating himself; or an admission or confession has

been extorted from him by force, or drawn from him by appliances to his hopes or fears."

In *People v. Adams*, 176 N. Y. 351, the defendant's office was searched by officers, and private personal property belonging to the defendant was seized. It being material in the trial court, it was offered in evidence, and objection was made that it had been unlawfully seized, and was, therefore, inadmissible. The Court of Appeals of New York said:

"The underlying principle obviously is that the court, when engaged in trying a criminal cause, will not take notice of the manner in which witnesses have possessed themselves of papers or other articles of personal property which are material and properly offered in evidence. In the case before us, if there has been any illegal invasion of .the rights of this defendant, by reason of alleged unlawful searches and seizures of private papers, his remedy is in an independent proceeding not necessary to be considered at this time."

It is unnecessary that we quote from the great number of state authorities recognizing the admissibility of evidence obtained by illegal seizure. See, however, *People v. Mayen*, (Cal.) 205 Pac. 435; *State v. Anderson*, 31 Idaho 514 (174 Pac. 124); *State v. Schmidt*, 71 Kan. 862 (80 Pac. 948); *State v. Flynn*, 36 N. H. 64; *People v. Aldorfer*, 164 Mich. 676 (130 N. W. 351); *State v. Reed*, 53 Mont. 292 (163 Pac. 477); *Starchman v. State*, 62 Ark. 538; *State v. Griswold*, 67 Conn. 290; *Williams v. State*, 100 Ga. 511; *State v. Sawtelle*, 66 N. H. 488 (32 Atl. 831); *Gindrat v. People*, 138 Ill. 103 (27 N. E. 1085); *State v. Pomeroy*, 130 Mo. 489, 497 (32 S. W. 1002); *Benson v. State*, 149 Ark. 633 (233 S. W. 758); *Younger v. State*, 80 Neb. 201 (114 N. W. 170); *State v. Harley*, 107 S. C. 304 (92 S. E. 1034); *Hughes v. State*, 145 Tenn. 544 (238 S. W. 588); *State v. Madison*, 23 S. D. 584 (122 N. W. 647); *Salt Lake City v. Wight*, (Utah) 205 Pac. 900; *State v. Douglass*, 20 W. Va. 770, 791; *Rippey v. State*, 86 Tex. Cr. Rep. 539 (219 S. W. 463; *State v. Royce*, 38 Wash. 111 (80 Pac. 268); *State v. Suiter*, 78 Vt. 391 (63 Atl. 182); *Chastang v. State*, 83 Ala. 29 (3 So. 304); *State v. Kaub*, 15 Mo. App. 433.

In *State v. Turner*, 136 Am. St. 129, the authorities are collected in an exhaustive note.

See, also, 1 Greenleaf on Evidence (16th Ed.), Section 254a; 3 Wigmore on Evidence, Section 2183.

The United States Supreme Court expressed the opposite view in *Boyd v. United States*, 116 U. S. 616, decided in 1885. This case has been the subject of frequent discussion by the courts of the country, as the cases cited supra will readily disclose, many state courts expressly refusing to follow it. Of course, the inferior Federal courts follow the rule laid down in the *Boyd* case.

The rule announced in the *Boyd* case has been reaffirmed by the Supreme Court of the United States in *Adams v. New York*, 192 U. S. 585; *Holt v. United States*, 218 U. S. 245; *Gouled v. United States*, 255 U. S. 298; *Amos v. United States*, 255 U. S. 313; *Weeks v. United States*, 232 U. S. 383; *Silverthorne Lbr. Co. v. United States*, 251 U. S. 385.

The holding in the *Boyd* case rests on the theory that the offered evidence was obtained from the defendant by unlawful search, in contravention of the Fourth Amendment to the Federal Constitution, which provides that:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."

It has been frequently held that the Fourth Amendment to the Constitution of the United States applies only to the Federal government and its agencies. *Weeks v. United States*, supra; *State v. Peterson*, 27 Wyo. 185 (194 Pac. 342); *Gindrat v. People*, supra; *City of Sioux Falls v. Walser*, (S. D.) 187 N. W. 821; *Brown v. New Jersey*, 175 U. S. 172; *People v. Mayen*, supra; *State v. Harley*, supra; *State v. District Court*, 59 Mont. 600 (198 Pac. 362).

However, the Constitution of this state, Article 1, Section 8, is identical in its language with the Fourth Amendment to the Federal Constitution.

In *State v. Van Tassel*, 103 Iowa 6, we had before us the question of the admission in evidence of certain letters, papers, and documents surreptitiously taken from the premises and possession of the defendant, without his consent. It was contended that this compelled him to give evidence against himself. We held that, under the record, the papers were not taken

surreptitiously, nor was the defendant compelled to give evidence against himself. We said: "The case is very different in its facts from *Boyd v. United States,* 116 U. S. 616."

We again considered the question somewhat in the case of *State v. Height,* 117 Iowa 650. In that case, the defendant, while confined in jail, was subjected to an examination by certain physicians who were called as witnesses by the State, to testify in regard to the result of such examination. We cited the *Boyd* case as sustaining the proposition that evidence so obtained could not be used against the defendant upon the trial of the crime. The case really turns, however, upon the proposition that the officers acted unlawfully in compelling the defendant to submit to the examination, which was, in effect, requiring him to furnish evidence against himself.

The *Boyd* case was again before us for consideration in *State v. Sheridan,* 121 Iowa 164. In that case, a search warrant was obtained, and the defendant's premises searched, and certain evidence obtained which was sought to be used in the trial against him. It was conceded that the search warrant was issued without authority of law, and that the search and seizure were wrongful, and for the sole purpose of obtaining testimony against the defendant. We said:

"For the purposes of this appeal we may admit it has often been held that the mere fact that evidence has been developed by the wrongful act or trespass of an officer or any other person will not necessarily render it inadmissible, but we are confronted by the further fact that the evidence objected to was obtained by a palpable abuse of judicial process."

We held, citing the *Boyd* case, that the evidence so received should have been excluded upon the trial.

We had the question before us again recently in the case of *State v. Rowley,* (Iowa) 187 N. W. 7, in which we followed the rule of the *Boyd* case, as announced in the *Height* case and the *Sheridan* case. That case is now pending on rehearing before this court.

We are now squarely confronted with the proposition as to whether or not we will continue to follow the Supreme Court of the United States in the rule of the *Boyd* case. The consideration of such a proposition may well "give us pause."

The question is of great importance in the administration of the criminal laws of the state.

Speaking of the *Boyd* case, Prof. Wigmore, in a recent article in the American Bar Association Journal, Vol. VIII, No. 8, p. 480, says:

"The foregoing doctrine [of the admissibility of evidence obtained by unlawful search] was never doubted until the appearance of the ill-starred majority opinion of *Boyd v. United States,* in 1885, which has exercised unhealthy influence upon subsequent judicial opinion in many states. That opinion, thoroughly incorrect in its historical assertions, and traveling outside the question at issue, advanced two fallacious conclusions, viz.: first, that the Fourth Amendment to the Constitution (prohibiting unreasonable search and seizure) was so related to the Fifth Amendment (prohibiting compulsory self-incrimination) that the Fifth Amendment could be invoked by an accused to withhold from surrender documents sought by even a *lawful* official search; and secondly, that documents obtained by *unlawful* official search could be excluded from evidence, as a consequence of the Fourth Amendment."

We cannot, within the reasonable length of an opinion, attempt to review all of the many cases that have expressly repudiated the doctrine of the *Boyd* case. The very decided weight of the decisions of the courts of the several states is against the rule of the *Boyd* case, which may appropriately be designated as the "Federal rule."

In addition to the cases cited supra, see also *Siebert v. People,* 143 Ill. 571, 583 (32 N. E. 431); *Trask v. People,* 151 Ill. 523 (38 N. E. 248); *People v. Paisley,* 288 Ill. 310 (123 N. E. 573); *Lawrence v. State,* 103 Md. 17 (63 Atl. 96); *Commonwealth v. Tibbetts,* 157 Mass. 519 (32 N. E. 910); *State v. Mausert,* 88 N. J. L. 286 (95 Atl. 991); *State v. Wallace,* 162 N. C. 622 (78 S. E. 1); *Knight v. State,* 16 Okla. Cr. 298 (182 Pac. 736).

Even some of the inferior Federal courts have been loath to follow the rule of the *Boyd* case, although it has been announced by the Supreme Court of the United States. See *United States v. Snyder,* 278 Fed. 650; *United States v. O'Dowd,* 273 Fed. 600.

It cannot be denied that the overwhelming weight of authority in the state courts is against the rule announced in the *Boyd* case. The due administration of the criminal law would be seriously hampered, and in many cases entirely subverted, by a strict adherence to this rule. We would not detract one iota from the full protection vouchsafed to the citizen by the constitutional provisions. A trespassing officer is liable for all wrong done in an illegal search or seizure. The constitutional provision is a sacred right, and one which the courts will rigidly enforce; but that does not mean that the State, in the prosecution of crime, cannot use any proper evidence available to it, without stopping to conduct an independent inquiry in the criminal proceeding as to how that evidence was obtained. Great public interests are involved in the due and efficient prosecution of crime. The vital question is whether or not the evidence is competent and relevant to the issue on trial.

The instant case furnishes a good example of the evil results that might readily follow from a rigid adherence to the rule of the *Boyd* case. The appellant was engaged in spreading the propaganda of the organization known as the "I. W. W." He was arrested, and shortly thereafter his suitcases were taken, without a search warrant, from the hotel where he was staying. These suitcases contained a large amount of evidence which was relevant and of great importance to the State, as bearing on the issue of appellant's guilt of the offense for which he was on trial. There is nothing to show that the officers knew, at the time of the seizure, that the suitcases contained this very important evidence. An information as the basis for a search warrant would necessarily have had to be predicated largely, if not wholly, on conjecture and suspicion. No one will question that, had this literature been seized in the presence of the appellant, when he was in the act of making a speech and distributing and dispensing the same, it would have been admissible on the trial of the criminal case. Why is it not equally admissible when seized a few minutes after his arrest, although not in his actual presence? It was just as germane to the question being tried, Suppose it had been stolen from the appellant, and then offered in evidence against him upon the trial of this case,—would it have been excluded? Certainly not.

*Burdeau v. McDowell,* 256 U. S. 465; Wigmore on Evidence, Section 2183.

As is said in *Gindrat v. People,* supra:

"Courts, in the administration of. the criminal law, are not accustomed to be over-sensitive in regard to the sources from which evidence comes, and will avail themselves of all evidence that is competent and pertinent and not subversive of some constitutional or legal right."

The due enforcement of criminal law would be most seriously handicapped in many instances, if not wholly crippled, by a strict adherence to the rule contended for by appellant. The exhibits taken from appellant's suitcases and offered in evidence upon the trial of this case were relevant to the question involved therein. They were, therefore, properly admissible, even though it is conceded that they were obtained by a search and seizure without warrant or strict legal authority. In this connection, it is also, perhaps, proper to observe that the constitutional provision applies only to "unreasonable searches and seizures."

In *United States v. Snyder,* supra, the court said:

"The amendment provides *not* that no arrest, search, or seizure should be made without a warrant, but prescribes that there shall be no *unreasonable* search and seizure; in other words, that the people shall be secure in their persons, houses, papers, and effects against *unreasonable* searches and seizures; *not against all searches and seizures, but simply against unreasonable searches and seizures.*"

Notwithstanding our previous holdings, and notwithstanding the rule recognized by the Supreme Court of the United States, we are disposed to and do hold that the objection to this evidence, when offered in behalf of the State, on the ground that it was obtained by an unlawful search, was not well taken, and that the court did not err in overruling said objection.

III. Furthermore, the appellant may well be held to have waived any right to claim that the exhibits in question could not be used in evidence against him. The suitcases and their con-

3. CRIMINAL LAW: tents were taken to the appellant, and he was
evidence:
waiver *in re* evi- asked to take therefrom anything he wanted.
dence wrong-
fully obtained. He removed a few articles, and left the re-

mainder with the officers, without objection or protest. He could, and we think did, waive any right to insist that the exhibits could not be used against him. This he may do, even under the Federal rule. *Perlman v. United States,* 247 U. S. 7.

IV. It logically follows from the foregoing that the court did not err in refusing to grant appellant's petition for a return of the property that had been seized. In the *Weeks* case, the Supreme Court of the United States recognized this as a proper procedure. But not many state courts have followed this rule.

4. CRIMINAL LAW: evidence: return of evidence unlawfully obtained.

In *State v. Mausert,* supra, the Court of Errors and Appeals of New Jersey considered a case where a defendant was convicted of keeping a disorderly house. The defendant made application to the court for an order to direct the prosecutor to return to him a register of the hotel which, it was claimed, had been obtained by an officer of the state, who forcibly entered the defendant's house and took away said register. The prosecutor admitted that the officer who took the book did not have a search warrant, and that the only warrant he held was a warrant for the apprehension of the defendant. The book was openly displayed on the counter at the hotel where the defendant was arrested. The court refused to order the book returned. The court reviewed the *Boyd* case and the *Weeks* case, and said:

"These books were in actual use as a means of carrying on an unlawful business, and were as much in defendant's possession and under his control when arrested as if he had them under his arm and dropped them on the floor. It is not a case where papers were secreted and intended to be kept private, nor of requiring the production of papers of like character; but rather, the taking of evidence of a crime then being committed, in the commission of which the books were a useful element."

In *State v. Hassan,* 149 Iowa 518, we had before us a somewhat similar situation. We said:

"On February 12th, defendants filed a motion for leave to inspect certain exhibits introduced before the grand jury, in which it was alleged that certain merchandise belonging to defendants had been taken from them without their authority,

at the time of their arrest; that they were denied the right of access thereto; and that, without examination, they could not properly prepare their defense. This motion was overruled, and exception taken. This proposition is argued upon the theory that the overruling of the motion deprived defendants of some constitutional right; the thought being, as we understand it, that the taking of the goods constituted an unreasonable search and seizure, and that thereby, and by reason of the ruling denying them access to the goods, they were deprived of their liberty without due process of law. *State v. Height*, 117 Iowa 650, and *Boyd v. United States*, 116 U. S. 616 (6 Sup. Ct. Rep. 523, 29 L. Ed. 746), are cited in support of the proposition. Neither case is in point. When defendants were arrested, it was the duty of the sheriff to take and care for their property; and if, perchance, any of the property so taken, in itself or when considered with other circumstances, bore some evidence of defendants' guilt, it was their misfortune. No unreasonable search or seizure was shown, nor were defendants deprived of any constitutional right. The trial court did not abuse its discretion in denying the motion. The indictment which was then pending against defendants was afterwards dismissed, and the motion was not renewed after the indictment on which the case was tried was returned. Again, there was no such showing regarding the necessity for the production of the property as would justify us in interfering with the order.''

Furthermore, the application for the return of the property was in the nature of an independent proceeding, wholly collateral to the issue involved in the trial upon the indictment in this case. It is, to say the least, doubtful if we could review the ruling on this petition in an appeal from a conviction of the crime charged in the indictment. See *People v. Mayen*, supra.

We hold that the court did not err in denying the appellant's application for a restoration of the seized property, before trial.

V. The State produced as a witness one McDonald, who testified that he lived in the city of Chicago, and was a police officer of said city, and for five years ''had been detailed in

5. CRIMINAL LAW:
evidence: re-
sult of investi-
gation.

charge of the field work of all revolutionary organizations that exist in the city of Chicago, and their propaganda." He testified that he had made a special investigation and study of the principles and purposes of the "I.W.W." organization, and thereafter, in answer to interrogatories, testified at length in regard to his experiences with said organization, and its teachings and purposes as so learned by him.

We think the evidence was proper. The testimony of the witness was largely corroborated by the literature previously referred to, offered in evidence by the State, disclosing the teachings and purposes of the "I.W.W." organization.

In *State v. Laundy,* (Ore.) 204 Pac. 958, the defendant was indicted for the crime of criminal syndicalism. In this case, the defendant was arrested in a public hall, and a large number of exhibits pertaining to the "I.W.W." organization were gathered up at the time of the arrest, and were introduced in evidence. The court recognized the general rule that the arresting officers may, at the time of making the arrest, lawfully take articles in the control of the prisoner, if they supply evidence of guilt.

In this case, the State offered in evidence the testimony of witnesses concerning the possession and distribution in the state of Washington of literature contributed to the "I.W.W." The court said:

"The organization described in the indictment is one which had its main headquarters in one place, with branches in different places throughout the country. If we find a society or organization with its main headquarters centered at a given point, with branches scattered throughout the country, and if we find copies of a given publication, attributable to that society as an organization, kept in halls of that society and in secret headquarters maintained in different cities, whether within or without this state, and if we find officers and members of that society disposing of copies in those different cities, then assuredly those facts constitute evidence from which we may infer that such society teaches and advocates the doctrines announced in such publication. All the publications concerning which Allen, Josh, Mitchell, and Keefe testified, contained mat-

ter from which it could be argued that they taught the pro-
hibited doctrines, and, indeed, some of them contained highly
inflammatory matter.   The court did not err in receiving the
testimony of these four witnesses concerning the possession,
sale, and distribution in the state of Washington of publications
attributable to the I.W.W.''

See, also, *State v. Pettilla,* 116 Wash. 589 (200 Pac. 332).

VI.   Error is predicated upon the admission in evidence
of a letter addressed to the appellant.

It appears that this letter was found upon the person of
the appellant at the time of his arrest; that it was a letter ad-
dressed to him, and contained the check which the appellant

6. CRIMINAL LAW: was seeking to have cashed at or about the time
evidence: ma-
teriality: letters  of his arrest.  It appears that the appellant had
of accused.      not only received this letter containing the
check, but had acted upon it, by appropriating the check and
endeavoring to cash the same.   The fact of its being in the pos-
session of the appellant when he was arrested, and that he ap-
parently had accepted it and acquiesced in it, and was acting
upon it in endeavoring to cash the check therein contained, was
a circumstance that might properly be considered by the jury
in the case, as tending to show appellant's connection with the
organization known as the ''I.W.W.''  The appellant could not
be bound by statements of the writer of said letter that in no
way connected the appellant with the organization referred to.
This would, of course, be hearsay.   The purpose for which the
letter could be considered by the jury would be a matter for
the court to cover by instruction.

Upon the record as presented, we find no error in the ad-
mission of this exhibit.

VII.   The statute providing for the punishment of criminal
syndicalism did not go into effect until the 4th day of July,
1919.

The State offered evidence in regard to the acts, teachings,
propaganda, and other similar matters of the ''I.W.W.'' or-
ganization prior to the said 4th day of July, 1919.   Much is

7. INSURRECTION   said in argument in regard to this matter, and
AND SEDITION:
criminal syndi-  there is an extensive citation of authorities by
calism: evidence. appellant in regard to the passage of an ex-

post-facto law, and also in regard to the admission in evidence
of proof of other similar offenses against a defendant who is
on trial, charged with a crime. None of this evidence tended to
show any act on the part of the appellant prior to the 4th day
of July, 1919, nor was it offered for any such purpose. The
appellant could not be prosecuted under the statute in question
for anything he did prior to the time such statute became ef-
fective. The purpose, however, of this evidence was to show
the beliefs, teachings, and propaganda of the organization known
as the ''I.W.W.,'' of which it was admitted the appellant was a
member. There was no attempt to charge the appellant with
having violated this statute by doing any unlawful act prior to
July 4, 1919; but it was admissible to show that, prior to said
time, the organization of which he was a member believed in
and promulgated certain doctrines and teachings, and that,
since the statute became effective in Iowa, the appellant was a
member of said organization, and was since said time promul-
gating the principles, practices, and doctrines of the said or-
ganization. These, once having been established and proved to
have existed prior to July 4, 1919, were presumed to have con-
tinued subsequent to that date. We think the evidence was ad-
missible for the purpose above suggested, and it does not appear
from the record that it was offered or used for any other pur-
pose. Furthermore, the court in the instant case instructed the
jury that the appellant could be liable only for acts committed
by him since the passage of the statute under which the indict-
ment was brought.

VIII. The court gave the jury the following instruction:

''A reasonable doubt is, as the words import, a doubt of
guilt which is founded in reason. It must be a real, substantial
doubt, and not one that is merely fanciful or imaginary. It
must not be sought after, nor should the evi-
dence be strained to create or induce it; for
when it is such a doubt as the law recognizes,
it must arise fairly and naturally in the mind,
upon a full consideration of all the facts and circumstances
shown in the evidence in the case. If, upon such consideration,
the mind hesitates and is unable to arrive at a conclusion of
guilt that is entirely satisfactory to itself, this will be a reason-

8. CRIMINAL LAW:
instructions:
absence of evi-
dence *in re* rea-
sonable doubt.

able doubt; and defendant should be given the benefit of it as such. If, however, the facts and circumstances proved are, in your judgment, so clear and satisfactory as to exclude from your minds all such doubts, they should be taken as true; and if they go to the whole case, and are against the defendant, you should convict of the offense as charged, as hereinafter stated.''

We cannot approve of this instruction. A reasonable doubt is not necessarily one that arises from a consideration of the facts and circumstances as shown *in evidence* in the case. A reasonable doubt, as a general rule, arises from a *want* of evidence. This instruction is similar in effect to one disapproved by us in *State v. Smith,* 192 Iowa 218 and in *State v. Smith,* 194 Iowa 639. Such an instruction should be avoided, although of itself it would not constitute reversible error.

IX. Complaint is made of Instruction 4, wherein the court told the jury the provisions of the statute defining criminal syndicalism, and instructed the jury that the State must satisfy the jury beyond a reasonable doubt, from the evidence, that the advocacy of the doctrines of the ''I.W.W.'' is a violation of the statutes above referred to.

9. CRIMINAL LAW: instructions: jury as judge of the law.

It is argued that this instruction made the jury the judges of the law. The objection is not well taken. The instructions must be read as a whole. This instruction was merely preliminary, in advising the jury of the particular statute under which the indictment was brought. Subsequent instructions definitely informed the jury in regard to the acts which must be proved by the State beyond a reasonable doubt, in order to justify a conviction of the appellant for violation of the statute.

We find no error at this point.

X. Complaint is made of the giving of Instruction No. 5, defining the word ''sabotage.''

The statute, Chapter 382, Acts of the Thirty-eighth General Assembly, among other things declares that ''criminal syndicalism is the doctrine that advocates crime, sabotage,'' etc.

The court gave the jury the following instruction:

''As to the meaning of the word 'sabotage,' you are instructed that, as here used, it means the practice which teaches the withdrawal of efficiency: that is, either to slacken up and

interfere ·with quality or production, or give poor 'service, or the destruction, directly or indirectly, or injury to the property rights of an employer by an employee, or one acting for him, in the furtherance of industrial or political ends, or his own pecuniary interest.''

**10. INSURRECTION AND SEDITION: criminal . syndicalism: "sabotage" defined.**

Our statute makes no definition of the word ''sabotage.'' The Century dictionary defines it as follows:

''Malicious injury done by an employee to the industrial establishment of his employer.''

Webster's New International Dictionary defines it as ''malicious waste or destruction of an employer's property by workmen during labor troubles.''

The instruction given by the court was too broad and inclusive. It did not conform to the usual and approved definitions of the word ''sabotage.'' As used in the statute, the word ''sabotage'' necessarily includes two elements: (1) malice and (2) injury to property. Neither of these elements was incorporated in the definition given by the court, and other elements were incorporated.

·  The instruction was erroneous. We think it was prejudicial to the appellant.

XI. By giving Instruction No. 6, the court used the following language:

''But if the aims and purposes of the association to which the defendant belongs and its teachings and practices are' all legitimate and peaceful, and that no injurious consequences can reasonably be apprehended, and does not come within the meaning of criminal syndicalism, as defined, then the defendant is not guilty, and you should acquit him.''

**11. CRIMINAL LAW: instructions: undue latitude to jury.**

The point is urged that the clause ''and that no injurious consequences can reasonably be apprehended'' left it to the jury to determine what might be ''injurious consequences'' that might follow from the teachings and practices of the ''I.W.W.'' The criticised clause should have been omitted from the instruction. It opened a door for the jury to speculate as to what ''injurious consequences'' they thought might be apprehended

from the teachings of the association.   This was an unwarranted latitude.   We cannot say that it was nonprejudicial.

The giving of this instruction was error.

XII.   Complaint is made of the following portion of Instruction No. 11:

"It is a fair and reasonable rule that, when a person joins or becomes a member of a conspiracy or association, that he adopts all the tenets, beliefs, and plans of such company or association as his own, and is as much responsible for the results and doings of such association as are the original members thereof."

12. CONSPIRACY: persons liable.

The appellant criticises this portion of the instruction. When standing isolated and alone, as an abstract proposition, this clause may be subject to criticism.   In *Commonwealth v. Hunt,* 4 Metc. (45 Mass.) 111, the Supreme Court of Massachusetts, speaking by Chief Justice Shaw, said:

"But in order to charge all those who become members of an association with the guilt of a criminal conspiracy, it must be averred and proved that the actual, if not the avowed, object of the association was criminal.   An association may be formed, the declared objects of which are innocent and laudable, and yet they may have secret articles, or an agreement communicated only to the members, by which they are banded together for purposes injurious to the peace of society or the rights of its members.   Such would undoubtedly be a criminal conspiracy, on proof of the fact, however meritorious and praiseworthy the declared objects might be.   The law is not to be hoodwinked by colorable pretenses.   It looks at truth and reality, through whatever disguise it may assume.   But to make such an association, ostensibly innocent, the subject of prosecution as a criminal conspiracy, the secret agreement which makes it so is to be averred and proved, as the gist of the offense.   But when an association is formed for purposes actually innocent, and afterwards its powers are abused by those who have the control and management of it, to purposes of oppression and injustice, it will be criminal in those who thus misuse it or give consent thereto, but not in the other members of the association."

There was no claim in the instant case, however, that the "I.W.W." was formed for purposes actually innocent, and that

afterwards its powers were abused by those in control. Appellant admitted his membership in the organization, and also his knowledge of its practices, objects, and purposes, and his full sympathy therewith. As applied to the facts in the instant case, the instruction was pertinent and proper.

XIII. Other errors are assigned in regard to portions of other instructions that were given by the court, and also in regard to the refusal to give certain instructions that were requested by the appellant.

Nearly every instruction is dissected by appellant's counsel, and the several parts subjected to microscopic examination. Most of the objections urged are highly technical and hypercritical. The subject-matter of the requested instructions, in so far as they embodied correct propositions of law, was covered by the instructions given by the court. The alleged errors are not likely to occur upon a retrial. The constitutionality of the statute is not challenged. With the wisdom of its enactment, the courts have no concern.

For the errors pointed out, the judgment of the district court is—*Reversed.*

EVANS, STEVENS, ARTHUR, and DE GRAFF, JJ., concur.

PRESTON, C. J., and WEAVER, J., concur in part and dissent in part.

WEAVER, J.—(dissenting). I concur in the majority opinion in so far as it relates to the error found in the trial court's charge to the jury, but beg leave to dissent from the argument and conclusion therein expressed upon the admissibility of the evidence obtained by seizure and search of the defendant's property. Stated as briefly as practicable, the reasons which influence me to withhold my concurrence in this holding by the majority are as follows:

I. Without attempting to follow in detail the discussion indulged in by the majority, I have first to say that there is no apparent good reason why we should overrule our former holdings as to the inadmissibility of evidence against the defendant which has been obtained by unreasonable or unlawful search or seizure, in violation of the con-

stitutional prohibition of such acts. That guaranty of protection has its origin in the express language of the Fourth Amendment to the Constitution of the United States, and was adopted and re-enacted as a part of the Constitution of Iowa, Article 1, Section 8. Naturally and properly, when the construction of this provision came up for consideration by the Iowa court, one of its first inquiries had reference to the construction, if any, placed upon it by the Supreme Court of the United States. There is no better established rule than that, when a state court undertakes to interpret or apply a statute which has been borrowed or adopted from a sister state, it will follow the judicial construction which has been placed upon it by the courts of the state in which it had its origin. The reason and propriety of this rule as between the several states apply with even stronger force as between the state and the Federal government; and the latter having by its court of last resort clearly interpreted the meaning and effect of the provisions, we could not reasonably do otherwise than recognize its controlling authority. This we did in *State v. Height,* 117 Iowa 650; in *State v. Sheridan,* 121 Iowa 164; and in *State v. Rowley,* recently decided, and now pending on a petition for rehearing. That those cases were properly decided is shown by the repeated decisions of the Federal court. *Boyd v. United States,* 116 U. S. 616; *Gouled v. United States,* 255 U. S. 298; *Amos v. United States,* 255 U. S. 313; *Weeks v. United States,* 232 U. S. 383. And see *Newberry v. Carpenter,* 107 Mich. 567; *Town of Blacksburg v. Beam,* 104 S. C. 146 (88 S. E. 441); *Silverthorne v. United States,* 251 U. S. 385.

It is, of course, to be admitted that certain state courts seem to be committed to the opposite view; but many, if not most, of the cases cited by the majority as opposed to the doctrine of the Federal cases are not really in point, in that they have been decided in states not having a constitutional guaranty identical with that of the Fourth Amendment to the national Constitution, and in others, the constitutional provision discussed has been one which Iowa does not have in express terms, to the effect that the defendant in a criminal prosecution shall not be compelled to be a witness against himself. The substance of the holdings in these cases is that pertinent evidence is not inad-

missible, or at least not necessarily inadmissible, merely because of the means employed in obtaining it. The very most which can be said for the view expressed by the majority is that there are two diverging lines of precedents upon the proposition involved, each of which has the support of respectable authority. We have long since chosen to follow the one established and adhered to by the Supreme Court of the United States, and I have yet to see or hear any sound argument for introducing confusion into our cases by reversing ourselves and repudiating the lead of the one court which above all others is in position to speak upon the subject with controlling effect. Moreover, as an original proposition, I insist that, if the constitutional guaranty which is discussed in the *Weeks, Boyd, Gouled,* and *Silverthorne* cases by the Federal court, and by the *Height, Sheridan,* and *Rowley* cases by this court, means anything, if it is not to be reduced to a mere soulless form of words, no construction thereof is possible which is not substantially in accord with the doctrine of those precedents. In the face of our constitutional guaranties, I confess it is not a little disconcerting to find the Supreme Court of Iowa putting itself on record in quoting approvingly and giving its adherence to the proposition that evidence is admissible "however unfairly and illegally obtained," even when it is procured under the circumstances which "meet with the unqualified disapprobation of the courts," so long as the accused has not been "compelled to do some positive, affirmative act inculpating himself." It is to the everlasting credit of the Supreme Court of the United States that it has firmly resisted the inclination to thus even inferentially lend its powerful influence to the breaking down of the protection which the Constitution provides for all citizens; the prisoner at the bar, no less than the richest and most exalted individual in society. Upon this feature of the case I cannot forbear quoting from the opinion of Holmes, J., in the *Silverthorne* case, supra. In that case, as in this, the prosecutor had obtained certain documents taken from the office of the defendants without legal authority, and, as in the present case, a motion was made to require a return or surrender to the owner of the material so obtained. The prosecution sought to avail itself of the evi-

dence so obtained, on the theory adopted by the majority in this case. Refusing to permit it, the court said:

"The government, while in form repudiating and condemning the illegal seizure, seeks to maintain its right to avail itself of the knowledge obtained by that means, which otherwise it would not have had. The proposition could not be presented more nakedly. It is that, although, of course, its seizure was an outrage which the government now regrets, it may study the papers before it returns them, copy them, and then may use the knowledge that it has gained, to call upon the owners in a more regular form to produce them; that the protection of the Constitution covers the physical possession, but not any advantages that the government can gain over the object of its pursuit by doing the forbidden act. *Weeks v. United States*, 232 U. S. 383, to be sure, had established that laying the papers directly before the grand jury was unwarranted, but it is taken to mean only that two steps are required, instead of one. In our opinion, such is not the law. It reduces the Fourth Amendment to a form of words. * * * The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the court, but that it shall not be used at all. Of course, this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source, they may be proved like any others; *but the knowledge gained by the government's own wrong cannot be used* by it in the way proposed."

It seems little less than solemn mockery for us to protest our devotion to the "sacred constitutional right," or our virtuous purpose to rigidly enforce it, and in the same breath declare our approval of the admission of "evidence without any inquiry as to how that evidence was obtained." The principle so involved finds a suggestive parallel in the case of the candidate for office who maintains his equipoise on the question of prohibition by declaring himself in favor of the law, but opposed to its enforcement. The suggestion that the person whose rights are invaded by a wrongful search or seizure has his remedy in an action for damages against the individual committing the trespass is scarcely worthy of the court which refuses to

give him the protection to which he is entitled under the charter which is supposed to command the obedience of the judiciary, as well as of the private citizen. It is this growing disregard of fundamental rights and orderly methods of justice which has given rise to the infamies of the so-called ''sweat-box'' and ''third-degree'' practices which cast discredit upon our professions of loyalty to law. The reasoning which justifies those things, and justifies a rule by which the court will refuse to inquire into the means employed to obtain evidence, if carried to its logical results, would be equally effective to admit evidence procured by physical torture, and restore the rack and thumbscrew to the dignity of judicial aids in the prosecution of alleged criminals. True, torture has been nominally outlawed in civilized lands, and the court would undoubtedly so declare, were that concrete question presented for its consideration; but the legal and constitutional guaranties of protection against the use of the torture chamber are not a whit less sacred than those which guarantee each and every citizen against illegal searches and seizures.

II. While it is, perhaps, unnecessary, for the purposes of this dissent, I desire to express peculiar regret that a case such as is presented by this record should be made the occasion for an opinion of such far-reaching consequences. The question of the constitutionality of the statute under which the appellant has been convicted is not discussed by the majority, and, for the purposes of this opinion, I shall assume its validity. It is the product of conditions created by the recent world war—an extraordinary piece of legislation which finds its moral justification, if any it has, in the exercise of the war power of the state for its protection against the machinations of its enemies from within its borders, as well as from without. Since it was devised for such commendable purposes, the average loyal citizen yielded cheerful obedience thereto, and few, if any, were disposed to object to its enforcement. With the return of peace, many have felt that the statute in at least some of its features has outlived its usefulness, and should be repealed or materially modified. In many respects, this statute is not unlike the Alien and Sedition Laws which were enacted by Congress in 1798, in anticipation of a threatened war with France, and which were

the subject of much political strife. They were, however, enacted as temporary measures, and expired by their own limitation in two years. Had the present act been made to expire with the return of settled peace, few just criticisms would now be heard of such legislation. It is, nevertheless, true that, as a piece of permanent statutory law, it contains much which is ill adapted to normal conditions of society in a republican or democratic form of government, and many of its provisions, from their very obscurity and vague and boundless generalities, afford material for endless trouble. No conviction under it should be sustained, unless it be upon the clearest and most satisfactory evidence, and in my judgment, the case made by the State falls far short of this requirement. It is, at best, an aggregation of trifles, no one of which is inconsistent with innocence of crime or criminal intent. The case seems to have been tried below on the theory (which the majority come dangerously near approving) that proof of membership in what is known as the "I.W.W." is all that is required to sustain the conviction. That such is not the law is not open to doubt. To hold that no crime is shown is not to approve or indorse the teachings or purposes of the society. These may be economically unsound or wild and sociologically impossible, without exposing their adherents to a charge of crime. Even the best of men are not all cast in one mold. Their theories of life, its duties and responsibilities, and their ideas of social order and the regulation of personal and property rights, may and do vary between wide extremes. It is the legitimate right of government to exact obedience to all constitutional legislation, but it is not within its authority to impose a penalty upon the operation of the citizen's mind or conscience or belief. Liberty of mind and conscience does not, of course, justify any infraction of the law of the land, but it does demand that the individual shall not be harassed by criminal prosecution for anything less than a well proved violation of the criminal law.

PRESTON, C. J. (dissenting). At the very outset, I desire to call attention to the all-important fact, and emphasize it, that, before the trial, the defendant made application for the return of the papers, which it is conceded were unlawfully seized.

While there is a conflict in the authorities as to the admissibility in evidence of such papers when objection is raised for the first time when the evidence is offered, there is little, if indeed there is any, conflict where such an application is made, overruled, and then the evidence is objected to at the trial. This is, as I think, the real distinction between the cases cited and relied upon in the majority opinion and those cited in the dissents. The rule is well stated in 10 Ruling Case Law 933 thus:

"It is obvious and the courts have frequently declared that, if letters and private documents may be seized in violation of the constitutional safeguard, and held and used in evidence against a citizen accused of a crime, then the constitutional provision is ineffectual and of no value. From this it may correctly be inferred, notwithstanding the many cases in which papers obtained by an unlawful search and seizure have been received in evidence over the objection of the violation of constitutional privilege, that there is a method by which the use of such evidence may be prevented. The principle underlying the decisions admitting the evidence is that an objection to an offer of proof made on the trial of a case raises no other question than that of the competency, relevancy, and materiality of the evidence offered, and that consequently the court, on such an objection, cannot enter on the trial of a collateral issue as to the source from which the evidence was obtained. But since there is a right, there *must of necessity be a remedy,* and the remedy is to be found in the making of a timely application to the court for an order directing the return to the applicant of the papers unlawfully seized. On such an application, the question of the illegality of the seizure may be fully heard, and if the court erroneously refuses to order a return of the papers, and thereafter receives them in evidence against the applicant, over his objection, it is an error for which a judgment of conviction must be reversed."

The importance and force of this seems to have been overlooked and substantially ignored in the majority opinion. It holds that there is no remedy, even though the constitutional guaranty has been violated. The New Jersey case and the Iowa case cited on this proposition are not at all in point, because the facts therein brought the cases within the rule that it is not an

illegal seizure to take articles from the person at the time of an arrest. The brief discussion of the majority on the question as to the filing of the petition puts the wagon before the horse. The majority opinion first determines that the evidence is admissible, and then says that, because of this, there was no error in overruling the petition. The point I wish to make is that, though it should be held that the evidence is admissible if no petition is filed, it is not admissible if the petition is filed. By filing the petition, the defendant does all he can to protect his constitutional rights, and does not waive his right to object to the testimony if the petition is erroneously overruled. It seems to me that filing the petition is not a collateral attack, but a direct proceeding to recover the papers. Whether the ruling on the petition can be reviewed on appeal is entirely beside the mark. If it is overruled, it renders the evidence inadmissible. The petition and ruling form the basis for the objection at the trial, and the admissibility depends on the question whether the application has been made. This is the holding of all the cases under such circumstances, so far as I have been able to observe. As seen, the underlying principle of the cases and the sole ground for holding the evidence admissible is that the courts will not stop a few minutes to investigate the legality of the seizure, and that, therefore, rather than to do so, it is better to render ineffective the guaranty of the Constitution. It is common practice to stop and investigate, where it is claimed that a confession has been obtained by duress.

I shall refer to this matter later herein, and cite many cases to support the doctrine above quoted. I should be inclined to follow the cases, including all our own, holding that the evidence is inadmissible even though no petition for return had been filed. In no other way can the constitutional guaranty against unreasonable searches and seizures be given full force. But when such an application is made, I think there can be no question about it. The cases are all one way, and, as we shall see later, there is really little, if any, conflict between the state and Federal courts. The ''cogent reasons'' for overruling everything do not exist.

I cannot agree to Paragraph 2 of the majority opinion. I concur in Paragraph 1 of the dissenting opinion of Mr. Justice

Weaver. Conceding the force of his dissent, it may be that I should not attempt to add anything thereto. However, I desire to add a few observations.

It may be thought that, since the defendant and the organization to which he belongs are seeking to destroy the government which protects him, if that be the fact, he is not entitled to protection. But one may be entirely out of sympathy with such purposes, and yet favor upholding the sacredness of the constitutional provisions, not only as to any one individual, but as to all the people, innocent as well as guilty. Hard cases make bad law sometimes. If the majority opinion based its ruling upon the proposition that the defendant consented to the abstraction of the papers from his suitcase, and that he waived his constitutional rights, there might be force in such a position. But for some reason it is thought necessary at this time to base the decision on another proposition, and to overrule and overturn all prior decisions of this court, other courts, and the United States Supreme Court, and follow the decisions of courts in states where, in some cases at least, the state Constitution was not, as in Iowa, copied from the Federal Constitution. The majority opinion says: "The constitutional provision is a sacred right, and one which the courts will rigidly enforce." But the opinion concededly is opposed to all the decisions of the Supreme Court of the United States, the highest court in the land, and many other courts, and, as I think, makes these constitutional provisions valueless. There may be a bare shred left when it is said, in effect, that the remedy is an action for damages for such a trespass, which may be committed by an officer or a private individual. The bond of the officer may be wholly inadequate, or the individual may be wholly impecunious,—a small recompense for a person who has been convicted and is serving a prison term upon evidence illegally secured and used. This is the protection guaranteed by the Federal and state Constitutions against unreasonable searches and seizures. When I say that these constitutional provisions are made of no value, I but voice the language of the Supreme Court of the United States, where it says, in the *Silverthorne* and *Weeks* cases, infra: "It reduces the Fourth Amendment to a form of words." It seems to be the fashion,

just now, to whittle away, little by little, the old landmarks; to take a nibble at the Constitution here and another nibble there; to smooth out the old-fashioned wrinkles and put in a new-fangled fad; and in this way, without any apparent effort, to make a mere form of words of a Constitution, and to do it quickly, while the iron is hot. Something must be changed all the time. It has been said that "a precedent embalms a principle." Uniformity of appellate decisions for the benefit of all the people ought to be the aim, rather than the individual interests of a litigant.

It is admitted that there is a conflict in the authorities on the question as to the admissibility of the evidence where no application to return the property has been made. This being so, this court could have adopted the other view, although it seems to me that the rule that was adopted was the only proper one. We did adopt a rule many years ago, as shown in the cases cited in *State v. Rowley*, (Iowa) 187 N. W. 7, and the cases cited by Mr. Justice Weaver in his dissent herein. A rule having been adopted, and, as I think, the right one, I am unable to see any reason why, at this particular time, all prior decisions should be overruled, some of them before the ink is dry, and a holding adopted which is directly opposite; and that, too, when the modern cases, particularly the decisions by the Supreme Court of the United States, are adhering strongly to the *Boyd* case, decided in 1885. It seems to me that there are good reasons why we should not change the rule. We have always held that, where a statute of this state has been borrowed from another state, and the Supreme Court of that state has construed that statute, we follow such construction. In the instant case, the section of the Iowa Constitution is the same as the Fourth Amendment to the Federal Constitution. The Supreme Court of the United States having repeatedly construed that provision, it seems to me that we should follow the interpretation of that court, and that we should follow the procedure of the Federal court, and return the property, on motion or petition, as well as hold that the evidence is inadmissible. In the *Rowley* case, supra, the sheriff had a warrant of arrest for the defendant. The arrest was made, and the defendant taken to jail by the sheriff's deputy. Thereupon, the sheriff proceeded to ransack

the home for private papers, and took with him private letters and other property, without any search warrant or any warrant of any kind, and without any authority. To my mind, a more unreasonable and high-handed proceeding is inconceivable. Some of the cases hold that a search without a search warrant is, from that fact alone, an unreasonable search. The holding of the majority opinion necessarily overrules the *Rowley* case, and requires the granting of a rehearing, since it is now pending on rehearing. Under this ruling, an officer or other person can, without let or hindrance, and in violation of the Constitution of this state and of the United States, go into any home, any lawyer's office, and the office of any business man, and ransack his private papers pertaining to confidential, professional, and business secrets, and take away with him such as he chooses to take. If, perchance, anything is secured which would be of benefit to an opponent in a lawsuit or a business rival, or if blackmail is attempted, though the party searched is wholly innocent of any wrongdoing, the person aggrieved can sue the officer or private individual for damages! In *Gouled v. United States*, 255 U. S. 298 (65 L. Ed. 647), the very thing which I have suggested was done. A person who was not an officer abstracted papers from plaintiff's offices, not under a search warrant, but as a friend. The Federal court ruled that this violated the Constitution, ordered the documents returned, and held that they were not admissible in evidence. The majority opinion in this case is opposed to such a holding. In the instant case, defendant's luggage was seized and searched, either while it was in his room at a hotel or in the lobby in the hotel, and papers abstracted and taken away, without the knowledge or consent of the defendant. It is conceded that there was no suspicion directed towards the defendant before the seizure; so there was no probable cause for a search warrant, had it been asked. Under the majority holding, the luggage of a man or woman on a train, in a depot, or in a hotel room or lobby may be searched, without any suspicion against such person, their traveling bags ransacked, and contents removed and taken away. This is to be the rule, not only as to this defendant, but as to all other persons, even if there be no suspicion against them.

Many other similar situations than those mentioned will occur to anyone upon a moment's reflection.

The last case on this subject which I am able to find is *State v. Wills;* 114 S. E. 261, where the Supreme Court of Appeals of West Virginia considers the question very fully, and cites many of the cases on either side. In the *Silverthorne* case, referred to and quoted from by Mr. Justice Weaver, there was an illegal search and seizure, and a clean sweep of the company's office was made, and its books, papers, and documents were taken. The court ordered the return; but before they were returned, the district attorney made photographic copies, and kept them. The company was then summoned to produce the originals. It refused, and an officer of the company was imprisoned for contempt. In reversing the judgment of contempt, the court used the language quoted by Justice Weaver. It is said by the majority, in effect,—and some of the cases cited do so hold,—that the courts do not care how the evidence is secured, or the source, if the evidence is competent. To this I cannot assent. The courts do care, and ought to care. So far as I know, no court has ever upheld so-called third-degree methods. It is said that men of the strongest character, absolutely innocent of crime, can be made to confess guilt, as a means of escaping the torture of the inquisition practiced, and where the methods employed are always with the tantalizing reward of rest and escape from the ordeal, held out as the price of confession. Thus a defendant is compelled to incriminate himself. The Supreme Court of the United States has held, and reiterated the holding in some of the cases cited, that the Fourth Amendment, prohibiting unreasonable searches and seizures, is closely allied to the Fifth Amendment, in regard to compelling one to incriminate himself. If the majority opinion stands, then every jail and detention office should be equipped with all the modern paraphernalia to carry out third-degree methods. If it be thought, as is held in some of the cases cited to sustain the majority opinion, that to inquire involves a collateral proceeding, and that the courts cannot stop to investigate, then it seems to me that this proposition is effectually answered in the *Wills* case, supra, and the cases therein cited, *People v. Marxhausen,* infra, and 10 Ruling Case Law 933, where, as here, ap-

plication was made to return the property before trial. I am unable to agree with my brothers that the overwhelming weight of authority sustains the majority opinion. As said, some of those cases are under Constitutions which were not copied from the Federal Constitution. I shall cite some, without attempting to cite all, the cases opposed thereto. Some of them are cited by Judge Weaver. *State v. Height,* 117 Iowa 650; *State v. Sheridan,* 121 Iowa 164; *State v. Rowley,* supra, and cases therein cited; *Boyd v. United States,* 116 U. S. 616; *Gouled v. United States,* 255 U. S. 298; *Amos v. United States,* 255 U. S. 313; *Weeks v. United States,* 232 U. S. 383; *Silverthorne v. United States,* 251 U. S. 385; *Newberry v. Carpenter,* 107 Mich. 567; *Town of Blacksburg v. Beam,* 104 S. C. 146 (88 S. E. 441, L. R. A. 1916 E, 714); *Youman v. Commonwealth,* 189 Ky. 152, 157 (224 S. W. 860, 13 A. L. R. 1303); *Ash v. Commonwealth,* 193 Ky. 452 (236 S. W. 1032); *Tucker v. State,* 128 Miss. 211 (90 So. 845); *People v. Marxhausen,* 204 Mich. 559 (171 N. W. 557, 3 A. L. R. 1505); *People v. Foreman,* 218 Mich. 591 (188 N. W. 375); *Callender v. State,* (Ind.) 136 N. E. 10; *State v. Gibbons,* (Wash.) 203 Pac. 390; *Hughes v. State,* (Tenn.) 238 S. W. 588. The *Weeks* case, supra, is referred to in L. R. A. 1915 B, 834, and cited in *Ex Parte Rhodes,* 202 Ala. 68, 76 (1 A. L. R. 568, 582). See, also, *State v. Fowler,* 172 N. C. 905, 911; *State v. Harley,* 107 S. C. 304, 306; *Barnard v. Judge,* 191 Mich. 567, 572; *State v. Anderson,* 31 Idaho 514, 525; *Rippey v. State,* 86 Tex. Cr. Rep. 539, 545; *State v. Hennessy,* 114 Wash. 351, 369; *State v. District Court,* 59 Mont. 600, 610, 613, and cases therein cited.

In the *Rippey* case, supra, at page 546, it is said that entry into a house for the purpose of search and seizure of stolen property, without a search warrant and over objection, may be resisted even to the extent of taking life; and that the person so entering does so at his peril. It occurs to me that the majority holding encourages such proceedings rather than orderly procedure, such as requiring the return of property unlawfully seized, upon proper application.

A large number of Federal cases all over the country cite the *Weeks* and others of the Supreme Court decisions. Naturally, it may be thought that they do, as they should, follow the

decisions of the higher court. The discussion and reasoning in some of the cases are instructive and helpful. Many of them are directly in point. Under the circumstances, I feel that I should not prolong the dissent by giving the title of such cases. There are many of them.

Some of the cases make a distinction (properly so, doubtless, though that question is not in this case) between a search and seizure in occupied buildings on private premises, and the seizure of intoxicating liquor in a public place. *People v. Case* (Mich.), 190 N. W. 289, and cases. In that case, the seizure was from an automobile in a fair ground, under a statute which provided for a forfeiture of the vehicle. In that case, it was held that a person possessing or transporting intoxicating liquor contrary to law has no property rights in it, and that, when the possession or transportation begins, it at once becomes the property of the state; so that there is no search or seizure of the property of the defendant. The opinion cites the *Boyd* case and the discussion therein in regard to the search and seizure of stolen or forfeited goods, as distinguished from search and seizure of a man's private books and papers.

I should have stated before that it has been thought that the *Boyd* case has been modified by some of the later decisions of the Supreme Court, and particularly by *Adams v. New York,* 192 U. S. 585 (48 L. Ed. 575). But Mr. Justice Day, who wrote the opinion in both the *Adams* and *Weeks* cases, says in the latter case that the *Boyd* case had been frequently cited by that court, and that there was no wish to detract from its authority. It was said by the Michigan court, in the *Marxhausen* case, 204 Mich., at 559 (171 N. W., at page 561):

"We are impressed, however, that a careful consideration of the *Boyd* case, in connection with the *Adams* case and the decisions of the state courts, some of which are cited above, * * * taken in the light of what was said by the court in the *Weeks* case, demonstrates that, in the main, the United States Supreme Court and the courts of last resort of the various states are in accord, and that the *Boyd* case does not conflict, as its critics claim, with the holdings of the many state courts. The *Adams* case and many state cases along the line of that case belong to one line of cases, while the *Boyd* and *Weeks* cases belong to

another class of cases. In the *Adams* and similar cases, the question of the legality of the search and seizure was sought to be raised collaterally, not by direct proceedings. In these cases, the objection was not made until the article or paper unlawfully seized was offered in evidence.''

It is true that in the *Adams* case it was held that, where objection was first made when the evidence was offered, it was a collateral attack, and that the objection was not well taken. This seems to be the theory of one line of cases. The other line of cases is, I take it, that, where there is a petition asking for the return of property and papers unlawfully seized, this is a direct attack, and that the proper procedure is to sustain the petition. Such a petition was made in the instant case, and overruled. I think it should have been sustained. If it had been, the evidence could not have been offered, and the question as to collateral attack would not arise. However, in the *Wills* case, supra, at pages 265 and 266, on the proposition as to whether the court will stop to hear testimony as to whether a confession was voluntary, the court said:

''We think this ground is untenable. It is not unusual, but, on the contrary, common practice, to stop the course of the trial and exclude the jury, while the court hears the testimony to determine whether it is competent. The jury returns, and the evidence, if competent, is heard by it; if incompetent, it is excluded. An instance familiar to every lawyer is where the State attempts to introduce a confession which the accused avers was obtained by duress or other unlawful means. It is done in other numerous instances, and it makes no difference whether the case be criminal or civil. The practice in no sense introduces a collateral issue.''

I think the same rule should apply in the instant case; or, if the majority opinion is to stand, to be at all consistent, it should be held hereafter that the court ''will not stop to investigate'' in any case, to determine whether a confession is voluntary or otherwise, but admit it, whether or no. The same underlying principle should apply to both or to neither.

The *Weeks* case, supra, and other cases hold that, where articles are illegally seized by an officer without a search warrant, upon the accused's premises, and where they would aid

in establishing his guilt, they will not be competent evidence, if a motion is made in the trial court, before the commencement of the trial, to return the articles seized in the course of the unlawful search, and objection is seasonably made to their introduction as evidence. It holds that immunity from unreasonable searches and seizures has been denied the accused, where the court has refused the application for the return of the letters and documents and permitted their use in evidence at the trial.

Other reasons occur to me why it seems to me that the majority opinion ought not to be adopted, but those stated will suffice, for present purposes. After the Declaration of Independence, the Articles of Confederation, the adoption of the Constitution, and the separation from the mother country were complete, it was found necessary, under conditions then existing, that the people—innocent people—all the people—should be protected from the then existing encroachments of the government, or rather, the over-zeal of its officers; and so, for that reason and purpose, the first ten amendments were proposed by Congress to the legislatures of the several states, and they were ratified. This was in 1789. For 134 years, until now, the protection guaranteed by the Constitution has meant something more than a "form of words." I would continue the protection, and follow the rule of the Supreme Court of the United States, that evidence secured by an unlawful search or seizure, as here, is incompetent, where a petition or application is made to return the property. When such a petition is filed, a hearing would be had thereon, and this would at least avoid the question as to whether the objection made when the evidence was offered on the trial raised a collateral issue. It seems to me that the majority opinion gives little, if any, weight to the fact that defendant did make such an application, and decides the case under authorities holding that the objection may not be made when the evidence is first offered on the trial. All the Federal cases hold that, if the proper application is made and overruled, the objection may then be made at the trial, and that it is error to admit the evidence.

It is said that enforcement of the criminal law would be handicapped by a strict adherence to the rule contended for: that is to say, if the Constitution is adhered to, upheld, and

defended, such would be the result. That may be so in some cases, but I submit that is not a sufficient answer. It should not be forgotten that the rights and interests of innocent people, guilty of no crime, are at stake.

The majority opinion has been rewritten and some changes made therein since this dissent was written. This is so as to the question of waiver. Otherwise, the opinion is not materially different. I would reverse on the ground that this evidence was improperly admitted, as well as upon the ground that the instruction was erroneous.